RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0175p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

BRISTOL REGIONAL WOMEN'S CENTER, P.C.; MEMPHIS CENTER FOR REPRODUCTIVE HEALTH, on behalf of itself and its patients, KNOXVILLE CENTER FOR REPRODUCTIVE HEALTH; PLANNED PARENTHOOD OF TENNESSEE AND NORTH MISSISSIPPI, formerly known as Planned Parenthood of Middle and East Tennessee, and DR. KIMBERLY LOONEY,

> *Plaintiffs-Appellees*,

*v.*

HERBERT H. SLATERY, III, Attorney General of Tennessee, GLENN R. FUNK, District Attorney General of Nashville, Tennessee, AMY P. WEIRICH, District Attorney General of Shelby County, Tennessee; BARRY P. STAUBUS, District Attorney General of Sullivan County, Tennessee, CHARME P. ALLEN, LISA PIERCEY, Commissioner of the Tennessee Department of Health, and W. REEVES JOHNSON, JR., M.D., President of the Tennessee Board of Medical Examiners, in their official capacities,

> *Defendants-Appellants*.

No. 20-6267

─────────────────────

On Petition for Initial Hearing En Banc

United States District Court for the Middle District of Tennessee at Nashville;
No. 3:15-cv-00705—Bernard A. Friedman, District Judge.

Argued En Banc: June 2, 2021

Decided and Filed: August 5, 2021

Before: SUTTON, Chief Judge; MOORE, COLE, CLAY, GIBBONS, GRIFFIN, KETHLEDGE, WHITE, STRANCH, DONALD, THAPAR, BUSH, LARSEN, NALBANDIAN, READLER, and MURPHY, Circuit Judges.

---

**COUNSEL**

---

**ARGUED EN BANC:**  Sarah K. Campbell, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants.  Autumn Katz, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, for Appellees.  **ON BRIEF AND SUPPLEMENTAL BRIEF:**  Sarah K. Campbell, Mark Alexander Carver, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants.  Autumn Katz, Michelle Moriarty, Rabia Muqaddam, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, Maithreyi Ratakonda, PLANNED PARENTHOOD FEDERATION OF AMERICA, New York, New York, Scott Tift, BARRETT JOHNSTON MARTIN & GARRISON, LLC, Nashville, Tennessee, Michael J. Dell, Jason M. Moff, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York for Appellees.  **ON AMICUS BRIEF:**  Elizabeth B. Murrill, OFFICE OF THE LOUISIANA ATTORNEY GENERAL, Baton Rouge, Louisiana, Kevin H. Theriot, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, Matthew F. Kuhn, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, Sarah A. Hunger, OFFICE OF THE ILLINOIS ATTORNEY GENERAL, Chicago, Illinois, Jessica L. Ellsworth, HOGAL LOVELLS US LLP, Washington, D.C., Kimberly A. Parker, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., Andrew M. Leblanc, MILBANK LLP, Washington, D.C., Michael L. Rosenthal, COVINGTON & BURLING LLP, Washington, D.C., Sarah Mac Dougall, COVINGTON & BURLING LLP, New York, New York, Jonathan F. Mitchell, MITCHELL LAW PLLC, Austin, Texas for Amici Curiae.

THAPAR, J., delivered the opinion of the court in which SUTTON, C.J., GRIFFIN, KETHLEDGE, BUSH, LARSEN, NALBANDIAN, READLER, and MURPHY, JJ., joined. BUSH, J. (pp. 14–16), delivered a separate concurring opinion in which GRIFFIN, J., joined. MOORE, J. (pp. 17–56), delivered a separate dissenting opinion in which COLE, CLAY, GIBBONS, WHITE, STRANCH, and DONALD, JJ., joined.  GIBBONS, J. (pg. 57), delivered a separate dissenting opinion.

---

**OPINION**

---

THAPAR, Circuit Judge.  Before making life's big decisions, it is often wise to take time to reflect.  The people of Tennessee believed that having an abortion was one of those decisions. So they passed a law requiring a waiting period of 48 hours.  Although the Supreme Court upheld a similar 24-hour waiting period in *Planned Parenthood v. Casey*, the district court said that Tennessee's waiting period violates a woman's right to have an abortion.  We disagree and reverse.

I.

Tennessee's waiting-period law resulted from a decades-long democratic process. In 1978, Tennessee enacted a 48-hour waiting period for abortions. 1978 Tenn. Pub. Acts, ch. 847, § 1. But a federal district court enjoined the law based on precedent that predated *Casey*. *See Planned Parenthood of Memphis v. Alexander*, No. 78-2310, 1981 U.S. Dist. LEXIS 18617, at *28–29 (W.D. Tenn. Mar. 23, 1981). Then, after *Casey* was decided, the Tennessee Supreme Court held that the waiting period violated Tennessee's constitution, even if it did not violate the Federal Constitution. *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 25 (Tenn. 2000). In response, Tennessee voters amended the State's constitution to clarify that it does not protect the right to an abortion. Tenn. Const. art. I, § 36; *see also George v. Hargett*, 879 F.3d 711, 714 (6th Cir. 2018).

After approving this constitutional amendment, the Tennessee legislature enacted a law restoring the 48-hour waiting period. That law requires doctors to provide women with certain information at least 48 hours before performing an abortion (except in cases of medical emergency). Tenn. Code Ann. § 39-15-202(a)–(h) (2019). This information includes the age of the unborn child, the alternatives to abortion, and the medical risks of abortion and pregnancy. *Id.* The law also provides that a 24-hour waiting period will take effect if a court enjoins the 48-hour waiting period. *Id.* § (d)(2).

A group of abortion providers then sued. The providers alleged that Tennessee's waiting period burdened access to abortion and was facially unconstitutional. Yet they did not seek a preliminary injunction, and the law went into effect in July 2015. For five years, the law remained in force. And for five years, women continued to obtain abortions in Tennessee: Abortion rates remained above 10,000 per year both before and after passage of the law.

Four years after the providers filed their suit, the district court held a bench trial. It heard testimony from witnesses, reviewed exhibits, and issued a published opinion. In that opinion, the district court balanced the law's benefits against its alleged burdens and concluded that the law was unconstitutional because it unduly burdened access to abortion. *Adams & Boyle, P.C. v. Slatery*, 494 F. Supp. 3d 488, 565, 570 (M.D. Tenn. 2020).

Tennessee sought a stay pending appeal from the district court. It pointed out that the district court's decision conflicted with Supreme Court and Sixth Circuit precedent governing waiting periods. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 871–76 (1992) (joint opinion); *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 366, 372–74 (6th Cir. 2006). Tennessee also noted that the Sixth Circuit had recently held that a benefits-burden test does not apply in the abortion context. *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418, 437–39 (6th Cir. 2020). But the district court refused to issue a stay pending appeal, and a panel of our court did too. *Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 988 F.3d 329 (6th Cir. 2021); *see also id.* at 344 (Thapar, J., dissenting).

Tennessee next moved for initial hearing en banc and sought a stay pending appeal from the en banc court. We granted both motions and now reverse on the merits.

II.

We start by explaining the relevant legal standard. A law regulating abortion is facially valid if it meets two requirements: (1) the law is "reasonably related to a legitimate state interest," and (2) the law does not place a "substantial obstacle" in the path of a large fraction of women "seeking an abortion of a nonviable fetus." *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 525 (6th Cir. 2021) (en banc) (quoting *EMW*, 978 F.3d at 433–34).[1]

The first requirement is met whenever the state has a rational basis to act. *Gonzales v. Carhart*, 550 U.S. 124, 158 (2007). Under the rational basis test, "legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). Courts

---

[1]The panel majority in *EMW* ably analyzed the Supreme Court's decision in *June Medical* and reasoned that the Chief Justice's concurrence is the "holding of the Court" under *Marks v. United States*, 430 U.S. 188, 193 (1977). *EMW*, 978 F.3d at 432–35. To the extent we were unclear in *Preterm*, we adopt *EMW*'s thorough analysis here.

The dissent disagrees. It claims that the Chief Justice's reasoning does not control because he concurred on stare decisis grounds. *See* Dissenting Op. at 38–40. But the controlling opinion in *Casey* itself relied on stare decisis principles while adopting a new framework—the undue burden standard. *See Casey*, 505 U.S. at 854–61 (analyzing and upholding the Court's precedent in *Roe v. Wade*, 410 U.S. 113 (1973)); *see also June Medical Servs. v. Russo*, 140 S. Ct. 2103, 2135 n.1 (2020) (Roberts, C.J., concurring in judgment). Just as the joint opinion in *Casey* adjusted the proper standard for evaluating challenges to abortion regulations while relying on precedent, so too did the Chief Justice's *June Medical* concurrence. What's more, in *Casey*, the plurality evaluated the waiting period using a nearly identical standard to the Chief Justice's.

may not second-guess a state's "medical and scientific judgments." *Preterm-Cleveland*, 994 F.3d at 525 (citation omitted). And they must defer to a state's judgment that there is a problem that merits correction. Indeed, the government has "no obligation" to produce evidence supporting the rationality of its actions. *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty.*, 430 F.3d 783, 790 (6th Cir. 2005).

If this standard appears "highly deferential," that's because it is. *EMW*, 978 F.3d at 438. The rule is designed to respect the constitutional prerogatives of democratically accountable legislatures and executives. So under rational basis scrutiny, an act remains constitutional even if—to the judge's eye—it seems to offer "little if any benefit." *June Medical Servs. v. Russo*, 140 S. Ct. 2103, 2137 (2020) (Roberts, C.J., concurring in judgment). All that matters is whether the state conceivably had a rational basis to enact the regulation at issue, judged under the standards of "traditional rational-basis review." *EMW*, 978 F.3d at 439–40.

When there is a rational basis for the law, courts must ask the second question: Does the law place a "substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus"? *Preterm-Cleveland*, 994 F.3d at 525 (citation omitted); *see also June Medical Servs.*, 140 S. Ct. at 2136–37 (Roberts, C.J., concurring in judgment). And for a facial challenge like this one, the standard is higher still. "Even if a law regulating abortion is unconstitutional in some applications, the law remains facially valid so long as it does not impose an undue burden in a large fraction of the cases in which the regulation is relevant." *Preterm-Cleveland*, 994 F.3d at 525 (citation omitted); *see also Casey*, 505 U.S. at 894–95 (joint opinion). Thus, a law regulating abortion is facially constitutional unless it places a substantial obstacle in the path of a large fraction of women seeking previability abortions.

III.

Having set forth the law, we now turn to the central issue in this case, which is whether Tennessee's 48-hour waiting period is facially constitutional. We answer that question by applying the two-step framework discussed above: (1) Did Tennessee have a rational basis for enacting the waiting period? And (2) if so, does the regulation place a substantial obstacle in the path of a large fraction of women seeking previability abortions in Tennessee?

A.

*Rational Basis.*   In *Casey*, the Supreme Court held that abortion waiting periods are rationally related to at least two legitimate state interests.  First, they are "a reasonable measure to implement the State's interest in protecting the life of the unborn." *Casey*, 505 U.S. at 885 (joint opinion).  And second, they are a reasonable way to ensure that a woman's consent is "informed and deliberate." *Id.*  Just as these rationales justified Pennsylvania's 24-hour waiting period, so too do they justify Tennessee's 48-hour waiting period.  Thus, Tennessee had (as a matter of law) a rational basis for enacting its waiting period.

In response, the plaintiffs argue that the factual record here does not support Tennessee's rationale.  Appellees' Br. at 47–48; *see also* Dissenting Op. at 51–54.  But that turns the rational basis standard on its head.  The government "has no obligation to produce evidence to sustain the rationality of its action." *TriHealth*, 430 F.3d at 790.  Nor are its rationales "subject to courtroom fact-finding" or a clash of proofs at trial. *Beach Commc'ns.*, 508 U.S. at 315.  All that matters is whether the government's policy can be supported by "rational speculation." *Id.*  And "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Heller v. Doe by Doe*, 509 U.S. 312, 320–21 (1993) (cleaned up).

Here, the Supreme Court has already told us that abortion waiting periods clear this very low bar.  "The idea that important decisions will be more informed and deliberate if they follow some period of reflection [is not] unreasonable, particularly where the statute directs that important information become part of the background of the decision." *Casey*, 505 U.S. at 885 (joint opinion); *see also EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 436–37 (6th Cir. 2019) (noting that informed consent is generally an important prerequisite to performing a medical procedure).  And a legislature could conclude that some women, even if the number is small, will opt not to have an abortion after this period of reflection.  Given Tennessee's strong "interest in protecting the life of the unborn," this sort of rational speculation is sufficient. *Casey*, 505 U.S. at 873, 885 (joint opinion).  For these reasons, the Tennessee legislature had a rational basis to enact a 48-hour waiting period.

B.

*Substantial Obstacle.*  Since Tennessee had a rational basis to act, the next question we must ask is whether the 48-hour waiting period poses a substantial obstacle for a large fraction of women seeking previability abortions in Tennessee.  The obstacle must be significant—burdens and inconveniences are simply not enough.  *Preterm-Cleveland*, 994 F.3d at 525 (citation omitted).  And because the plaintiffs are bringing a facial challenge, they must show that such an obstacle exists for a large fraction of the women for whom the regulation is relevant (that is, all women seeking previability abortions in Tennessee).  *Id.*

To date, we have never explained what exactly constitutes a large fraction.  We have said that the test is "more conceptual than mathematical."  *Taft*, 468 F.3d at 374.  But we have also rejected out of hand the notion that 12.5% could be enough.  *Id.* at 372–74.  Indeed, it would be odd to hold that a law regulating abortion is facially unconstitutional when it can be applied consistent with the Constitution in a majority of cases.  *See, e.g.*, Webster's Third New International Dictionary 1272 (2002) (defining "large" as "dealing in great numbers or quantities").  But wherever the precise line is drawn, Tennessee's waiting-period law is not a substantial obstacle to abortion in a large fraction of cases.  Thus, the plaintiffs' facial attack fails as a matter of law.

Precedent compels this result.  In *Casey*, the Supreme Court held that Pennsylvania's 24-hour abortion waiting period was not an undue burden.  In doing so, the Court recognized that the law (1) would often cause delays of "much more than a day" given the need to schedule two appointments; (2) would be "particularly burdensome" for "those women who have the fewest financial resources, those who must travel long distances, and those who have difficulty explaining their whereabouts to husbands, employers, or others"; (3) might lead to women experiencing additional "harassment" or "hostility"; and (4) would have "the effect of increasing the cost and risk of delay of abortions."  *Casey*, 505 U.S. at 886 (joint opinion) (cleaned up).  Still, the Court held that these findings were not enough to "demonstrate that the waiting period constitutes an undue burden."  *Id.*  This was true even for the women most affected by the law, such as those with low incomes.  *Id.* at 886–87.

After *Casey*, our court held that Ohio's 24-hour waiting period was constitutional. *Taft*, 468 F.3d at 372–74. We recognized that the waiting period might have the "effect of delaying abortions up to two weeks." *Id.* at 366. And we noted that some women might be unable to attend two in-person appointments "due to domestic abuse." *Id.* at 373. Still, we held that the law was facially constitutional because it did not pose a substantial obstacle to abortion for a large fraction of the women to whom it applied (even if it might pose a serious obstacle for some subset of them). *Id.* at 372–74.

In this case, as in others, "the hardships of which plaintiffs complain are generally no different than those the Court in *Casey* held did not amount to an undue burden." *Karlin v. Foust*, 188 F.3d 446, 486 (7th Cir. 1999). True, there are increased costs, delays, and logistical challenges associated with attending two appointments. *See Adams & Boyle*, 494 F. Supp. 3d at 562–65. And as the district court explained, these problems are especially severe for women with low incomes and in precarious social situations. *Id.* But those burdens mirror the burdens held insufficient in *Casey*. 505 U.S. at 886–87 (joint opinion).

Indeed, the factual findings by the district court in *Casey* are analogous to the district court's factual findings here. For example, the district court in *Casey* found that the waiting period would "result in delays far in excess of 24 hours," with a majority of women facing delays of "48 hours to two weeks." *Planned Parenthood of Se. Pa. v. Casey*, 744 F. Supp. 1323, 1351 (E.D. Pa. 1990). Similarly, the district court here found that depending on the provider, patients could sometimes wait one to three weeks after their first appointment, rather than the statutory 48 hours. *Adams & Boyle*, 494 F. Supp. 3d at 505, 511–12, 519–20. Both district courts also found that two appointments would increase costs related to transportation, lodging, lost wages, food, and childcare. *Compare Casey*, 744 F. Supp. at 1352, *with Adams & Boyle*, 494 F. Supp. 3d at 505, 514, 518. And both courts noted that the waiting period would "be particularly burdensome" for low-income women. *Casey*, 744 F. Supp. at 1352; *see Adams & Boyle*, 494 F. Supp. 3d at 531–32. The Supreme Court analyzed these findings, but still held that Pennsylvania's waiting period did not unduly burden access to abortion. *Casey*, 505 U.S. at 886–87 (joint opinion). We follow suit and hold that these findings do not amount to a substantial obstacle.

If there is any distinction between the record in *Casey* and ours, it is the statistical evidence that women in Tennessee continued to obtain abortions in large numbers after the waiting period took effect. In *Casey*'s pre-enforcement challenge, the courts relied on expert testimony predicting the effects of the law. But the Tennessee law had been on the books for five years by the time the plaintiffs sued. And five years of data tell us much more than an expert's prediction of how the law will play out. It is one thing to predict that the sky will fall tomorrow. It's quite another thing to maintain that the sky fell five years ago for women seeking abortions when the numbers tell us otherwise: The year before Tennessee enacted the law, its clinics performed 12,373 abortions. CA6 R. 20, Ex. C. And the year after Tennessee enacted the law, its clinics performed 11,235 abortions. *Id.*, Ex. E. And the next two years also saw abortion numbers in the State hover just under 11,000.[2] So while abortions declined slightly (by about 9%), the law did not keep a large fraction of abortion seekers from obtaining the procedure.

Tennessee also points out that its waning abortion rate tracked broader national trends—a fact the plaintiffs do not dispute. This suggests that the decline was caused by factors other than the state's waiting period. But even if the waiting period were the cause, a moderate reduction in the number of abortions is consistent with a law designed to "protect[] the life of the unborn." *Casey*, 505 U.S. at 885 (joint opinion). And in any case, nine percent is not a "large fraction." So even beyond the experts' assessments, the data alone foreclose the plaintiffs' facial attack. Because the statistical evidence shows that most women were not prevented from obtaining abortions in Tennessee, the plaintiffs cannot invalidate the law on its face.

Though the numbers show that most women who wanted an abortion continued to access abortion services in Tennessee, the district court identified several other hurdles as part of its undue-burden analysis. But as the data show, all fall well short of being a substantial obstacle to abortion for a large fraction of women seeking previability abortions in Tennessee.

---

[2]Even if the waiting period did reduce the number of abortions, Judge Bush thoughtfully points out that plaintiffs would need to show that the waiting period posed a substantial obstacle to those women who still wanted an abortion. Not those who reflected on the choice and chose to have a child.

For example, the district court found that "[a]s gestational age increases, an abortion becomes . . . riskier for the patient." *Adams & Boyle*, 494 F. Supp. 3d at 563. For a health risk to potentially pose an undue burden, that risk must be at least "appreciable." *Casey*, 505 U.S. at 885 (joint opinion). Yet at trial, the plaintiffs' own expert testified that "surgical abortion at all times remains very safe." *Adams & Boyle*, 494 F. Supp. 3d at 501; *see also id.* at 505 (finding this testimony "fully credible" and giving it "great weight"). To be sure, the district court cites testimony suggesting that medical risk increases slightly as gestational age increases. But minimal increases in risk cannot create appreciable medical risk when, as the plaintiffs contend, the procedure is not risky to begin with. *See Tucson Women's Ctr. v. Ariz. Medical Bd.*, 666 F. Supp. 2d 1091, 1103 (D. Ariz. 2009) (noting that the risk of death from an abortion is "one in 1,000,000" at eight weeks or earlier, and that for each week beyond then, "[p]laintiffs cite a 38% increase in risk, but 38% of a very small number is still a very small number"). Thus, the increase in risk cited by the district court does not amount to a substantial obstacle to abortion for a large fraction of women. And in cases of genuine medical emergency, Tennessee's waiting-period law permits abortions to proceed immediately. Tenn. Code Ann. § 39-15-202(d), (f)(1).

Next, the district court found that as a result of the waiting period (and associated delays), some women will miss the cutoff for medication abortions. *Adams & Boyle*, 494 F. Supp. 3d at 562–63. But the Supreme Court "has not extended constitutional protection to a woman's preferred method . . . of terminating a pregnancy." *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 516 (6th Cir. 2012). To the contrary, in *Gonzales v. Carhart* the Supreme Court held that the government may ban a method of abortion so long as a "commonly used and generally accepted method" of abortion remains available. 550 U.S. at 165–67. Here, no one disputes that surgical abortion—a procedure the plaintiffs contend is "very, very safe"—remains available after the period for obtaining a medication abortion has lapsed. R. 219, Pg. ID 4535.

The dissent claims that surgical abortion is not an adequate alternative, because some women prefer medication abortion. But the only legal authority it cites is a two-Justice dissent from the grant of a stay. Surgical abortion is "commonly used and generally accepted," precisely what the Court in *Gonzales* demanded. And *Casey* also considered these consequences:

The district court in that case found that the waiting period would sometimes "push patients into the second trimester of their pregnancy substantially increasing the cost of the procedure itself and making the procedure more dangerous medically." *Casey*, 744 F. Supp. at 1352. As in *Casey*, this change in procedure does not present a substantial obstacle.[3]

The district court also held that Tennessee's waiting period is "demeaning to women" and "undermines patient autonomy and self-determination." *Adams & Boyle*, 494 F. Supp. 3d at 564–65. But whether a law is dignifying or demeaning is a question for legislators, not judges. *See Preterm-Cleveland*, 994 F.3d at 536 (Sutton, J., concurring) ("The National Constitution permits States to convey their interest in the dignity of all human beings in all manner of ways."). And more importantly, the district court's factual findings show these sorts of concerns did not deter a large fraction of women from obtaining abortions in Tennessee.

Finally, the district court found that Tennessee's waiting-period law "places significant burdens on the clinics themselves." *Adams & Boyle*, 494 F. Supp. 3d at 565. But the clinics have "no constitutional right to perform abortions." *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 915 (6th Cir. 2019) (en banc). That is why burdens on abortion providers are relevant only if they unduly burden women's access to abortion. *Id.* at 912–16. Tennessee's law does not require clinics to close or doctors to stop performing abortions. *Cf. June Medical Servs.*, 140 S. Ct. at 2133–34 (Roberts, C.J., concurring in judgment); *EMW*, 978 F.3d at 446. And for the reasons discussed elsewhere in this opinion, the waiting period does not unduly burden abortion more broadly. So this rationale offers no independent basis for finding that Tennessee's law poses a substantial obstacle to abortion.[4]

---

[3]The plaintiffs also argue that delays will cause some women to miss the cutoff for obtaining an abortion entirely. But since the plaintiffs never suggest that this is true for a large fraction of the women seeking an abortion, this argument is a nonstarter. *See Preterm-Cleveland*, 994 F.3d at 525.

[4]The district court and the dissent also argue that *Casey* is distinguishable because Pennsylvania had more abortion clinics when *Casey* was decided than Tennessee does today. *Adams & Boyle*, 494 F. Supp. 3d at 566–67; Dissenting Op. at 42. This argument is predicated on a legal error. The Court in *Casey* did not rely on the number of clinics in Pennsylvania. In fact, no opinion even mentions the statistic. Courts cannot narrow Supreme Court holdings based on facts the Court did not consider. *See Montejo v. Louisiana*, 556 U.S. 778, 788 (2009) (rejecting the dissent's "revisionist view" of a prior case because it rested on "a non sequitur nowhere alluded to in the case") (cleaned up); *Lucia v. SEC*, 138 S. Ct. 2044, 2054 (2018) (cabining the holding in *Freytag v. Commissioner*, 501 U.S. 868 (1991) to arguments the Court discussed in its analysis). What's more, even on its own terms, this attempt to distinguish *Casey* falls short. The population of Tennessee in 2020 is a bit over one-half of Pennsylvania's

One further note.   The plaintiffs suggest at various points that the district court's factfinding insulates its undue-burden determination from a hard look on appeal.   That is incorrect.   True, we defer to a district court's factfinding under the clear error standard.   But whether particular facts amount to an undue burden is a question of law that we review de novo. *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 460 n.1 (6th Cir. 1999); *see also A Woman's Choice–East Side Women's Clinic v. Newman*, 305 F.3d 684, 689 (7th Cir. 2002). Otherwise, there would be "arbitrary discretion in the courts." *June Medical Servs.*, 140 S. Ct. at 2134 (Roberts, C.J., concurring in judgment) (quoting Federalist No. 78); *see also Am. Jewish Cong. v. City of Chicago*, 827 F.2d 120, 129 (7th Cir. 1987) (Easterbrook, J., dissenting) ("When everything matters, when nothing is dispositive, when we must juggle incommensurable factors, a judge can do little but announce his gestalt."), *abrogation on unrelated grounds recognized by Woodring v. Jackson Cnty., Ind.*, 986 F.3d 979, 993 (7th Cir. 2021).   So we analyzed the facts presented in this case and applied the law to those facts.   And reviewed de novo, Tennessee's 48-hour waiting period is not a facially undue burden.

## IV.

After we granted en banc review, we allowed the parties to file simultaneous supplemental briefs.   The plaintiffs claimed in that brief that the law—even if valid on its face— is unconstitutional as applied to certain groups of women.   They identified three groups: (1) women who will miss the cutoff date for an abortion because of the 48-hour waiting period; (2) women whose medical conditions increase the risk of delaying the procedure; and (3) women who are survivors of rape, incest, or intimate partner violence.   But the plaintiffs failed to identify any "discrete and well-defined instances" where women in these groups faced (or were likely to face) a particular burden because of Tennessee's waiting period—the foundation for an as-applied challenge. *See Gonzales*, 550 U.S. at 167.

Indeed, the law has been in effect for more than five years, and still the plaintiffs have failed to name a single woman who has suffered an increased burden for any of these three

---

population in 1992.   And as the district court notes elsewhere in its opinion, "the calculation of Pennsylvania providers [in 1992] also included smaller OB/GYNs or hospitals that performed abortions, which were not included in the calculation of Tennessee providers." *Adams & Boyle*, 494 F. Supp. 3d at 519 n.24.

reasons. None of the plaintiffs' witnesses could name specific women who could not get an abortion because the waiting period pushed them past the cutoff date. None of the witnesses could identify specific women whose medical conditions caused complications or psychological harm during the waiting period. And none of the witnesses could point to specific women who, due to experiences of rape, incest, or abuse, found the waiting period traumatizing or were prevented from obtaining an abortion. This lack of evidence is fatal to their as-applied challenge. So it too must fail.

* * *

Tennessee's 48-hour abortion waiting period is facially constitutional. The law is supported by a rational basis, and it is not a substantial obstacle to abortion for a large fraction of women seeking previability abortions in Tennessee. And the plaintiffs failed to present any specific evidence to sustain their as-applied challenge. We thus reverse the district court's decision and remand for entry of judgment in Tennessee's favor on these claims.

————————————

**CONCURRENCE**

————————————

JOHN K. BUSH, Circuit Judge, concurring.   Although I concur fully in the majority opinion, one aspect of its reasoning warrants further discussion.

Normally, when a party mounts a facial challenge to the constitutionality of a law, it is required to show "that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).  But as is so often the case, the rules change when abortion is on the line. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2321 (2016) (Thomas, J., dissenting).   In *Planned Parenthood v. Casey*, the three-justice plurality derived from the Fourteenth Amendment a unique, quasi-arithmetic test that would permit courts to disregard as unconstitutional those laws that impose a substantial obstacle to abortion access not in all or even most applications, but in a mere "large fraction" of cases. 505 U.S. 833, 895 (1992).

What constitutes a large fraction?  We have answered that question evasively in the past, noting that the test is "more conceptual than mathematical," yet concluding that 12.5 percent is not enough. *Cincinnati Women's Servs. v. Taft*, 468 F.3d 361, 374 (6th Cir. 2006).  According to the Fifth Circuit, thirty percent is not a "large fraction." *June Med. Servs., LLC v. Gee*, 905 F.3d 787, 815 (5th Cir. 2018), *rev'd on other grounds*, 140 S. Ct. 35 (2019).   But in the Eighth Circuit, eighteen percent is. *See Planned Parenthood v. Miller*, 63 F.3d 1452, 1464 n.10 (8th Cir. 1995).   And in a recent decision, a panel of the Eleventh Circuit eschewed statistical precision altogether and, instead, went with its gut. *See Reproductive Health Services v. Strange*, No. 17-13561, 2021 WL 2678574, at *19-20 (11th Cir. June 30, 2021) (concluding that the denominator is "roughly four a year—but perhaps several more," and that the numerator is "a handful.").  Whatever the merits, or demerits, of the large-fraction test, we are bound to apply it.  So it is worth taking a moment to consider how we are to do so.

The majority rightly discerns the glaring weakness of Plaintiffs' large-fraction analysis: that in the year after Tennessee implemented the waiting-period law, abortions decreased by only

nine percent. Even assuming that the entire decrease is attributable to the new law, nine percent is a small fraction, not a large one. *See Taft*, 468 F.3d at 374 (6th Cir. 2006). Furthermore, as the majority notes, at least "a moderate reduction in the number of abortions" is to be expected given that the purpose of the law is to advance the state's legitimate interest in protecting unborn life. *Ante*, at 9.

To make its point, the majority opinion assumes, for purely illustrative purposes, that the entire drop in the abortion rate was the result of some undue burden imposed by the waiting-period law. But it is worth clarifying, for the benefit of future litigants, that courts are not bound by that assumption, as it rests on an unproven premise. The premise is that any drop in the abortion rate resulting from an abortion law is evidence that the law imposes a burden, and that if the drop is drastic enough, resulting in more than "a moderate reduction in the number of abortions," *id.*, the law is ipso facto unconstitutional. That is not how the large-fraction analysis works.

To satisfy the large-fraction test, Plaintiffs must show a causal connection between the decrease in the number of abortions and the substantial obstacle the law supposedly imposes. *See Planned Parenthood v. Casey*, 505 U.S. 833, 895 (1992). That is, Plaintiffs must differentiate between those women who wanted to get an abortion but were stymied by the requirements of the law and those who, after attending an informed consent meeting, freely decided to carry the child to term. So, for instance, a plaintiff might present a multiple-regression analysis designed to assess whether a decrease in abortions is "an effect not of the persuasive power of the law, but rather of its burdensome qualities." *A Woman's Choice - E. Side Women's Clinic v. Newman*, 305 F.3d 684, 714 (7th Cir. 2002) (Wood, J., dissenting). As to those for whom the regulation "is an actual rather than an irrelevant restriction," the law is invalid only if a large fraction of them are prevented from obtaining an abortion. *Casey*, 505 U.S. at 895.

Plaintiffs here did not provide anything approaching a rigorous statistical analysis. And despite their contention that the two-appointment requirement imposes forbidding financial and logistical burdens on low-income women, Plaintiffs could not identify a single woman whom the law effectively barred from obtaining an abortion "as surely as if the government ha[d] outlawed

abortion in all cases." *EMW*, 978 F.3d at 434 (brackets omitted). To the contrary, Plaintiffs' witnesses candidly acknowledged that abortion clinics do not keep track of women's reasons for declining to go through with the procedure after attending the informed consent meeting. Indeed, one witness, a Planned Parenthood executive, noted that there are so many potential reasons a woman may decide not to return for an abortion after the waiting period that "[i]t's impossible to know why patients no-show." *Adams & Boyle, P.C. v. Slatery*, 494 F. Supp. 3d 488, 558 (M.D. Tenn. 2020) (alteration in original).

A constitutionally valid law does not become unconstitutional just because it happens to be effective. Under our caselaw, states are free to enact laws that are rationally related to their legitimate interest in protecting unborn life, provided those laws do not deter procurement of abortions in a manner tantamount to a pure ban. *See EMW*, 978 F.3d at 433–34. Of course, as the majority demonstrates, none of the obstacles to abortion access that Plaintiffs have alleged are substantial under *Casey*. *Ante*, at 7–10. But even if they were, Plaintiffs did not show that the law prevented a large fraction of women from obtaining abortions by means of coercion and not persuasion. Indeed, if the Tennessee law had resulted in not a nine percent but a hundred percent decrease in total abortions, that fact alone would be insufficient to satisfy the large-fraction test. It is possible that the law, which was intended in part to persuade expectant mothers to reconsider their decision to get an abortion, simply succeeded. A litigant mounting a facial challenge has the burden of proving that the real reason for the decrease is that the law creates a substantial obstacle that is decisive in a large fraction of cases. *See Preterm-Cleveland v. McCloud*, 994 F.3d 512, 534 (6th Cir. 2021).

In other words, for our purposes it does not matter if many or even most women who decline to go through with an abortion after attending the mandatory informed-consent appointment were persuaded to carry the child to term, so long as they were not prevented from getting an abortion had they chosen it. Though it does not matter for our purposes, it matters a great deal to the state, to the mother, and to the unborn child. After all, that is the point of the waiting-period law: to ensure more time for an expectant mother to make an informed decision in the hope that she will choose life.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting.   In cases of a constitutional challenge to a state abortion regulation, *Planned Parenthood of Southeast Pennsylvania v. Casey* tasks courts with determining whether the restriction unduly burdens a woman's right to choose to terminate her pregnancy before viability.  505 U.S. 833, 878 (1992) (joint op.).[1]  The Supreme Court's precedent teaches that the inquiry is a fact-intensive one.  *See id.* at 884–86.  Indeed, even when faced with an abortion regulation that is substantially similar on paper to one that it has already invalidated, the Supreme Court has insisted upon a thorough analysis of the record established in the lower courts before reaching the same result.  *Compare Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) (Texas statute requiring abortion providers have admitting privileges at local hospital); *with June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2112 (2020) (plurality op.) (Louisiana statute requiring abortion providers have admitting privileges at local hospital); *and id.* at 2133 (Roberts, C.J., concurring in the judgment).

Heeding the Court's charge faithfully, the district court below issued a comprehensive, 136-page opinion setting forth the findings of fact and conclusions of law that supported its holding that Tennessee's 48-hour waiting period for abortions is an undue burden on the right of Tennessee women to terminate their pregnancies.  Considering the waiting period's practical effects, the district court found "that the statutory waiting period burdens the majority of abortion patients with significant, and often insurmountable, logistical and financial hurdles"—delaying the procedure far more than the nominal 48 hours and increasing the cost of the procedure alone as much as twofold.  *Adams & Boyle, P.C. v. Slatery*, 494 F. Supp. 3d 488, 563 (M.D. Tenn. 2020).  Coupled with the costs of attending a second in-person appointment—travel expenses, lost wages, childcare, and more—the district court found that the waiting period put the 60 to 80 percent of women seeking an abortion in Tennessee who qualify as low-income at "grave risk" of sacrificing basic necessities in order to have an abortion.  *Id.* at 564.  The district court found, moreover, that the law's actual delays—as long as four weeks for a second appointment—pushed

---

[1]Citations to *Casey* in this opinion are to the controlling joint opinion unless otherwise indicated.

many women past the cutoff for a medication abortion, forcing them to undergo a more invasive, painful, and costly surgical procedure to terminate their pregnancies. *Id.* at 562–63. And the district court found that Tennessee's abortion waiting period causes all of these burdens without benefitting women's decisional process or mental health; indeed, the district court found that the law instead stigmatizes women by exacerbating harmful stereotypes about women as irrational, emotional, and incapable decisionmakers. *Id.* at 557–62, 564–65.

Rather than plunge into the vast pool of evidence compiled in the district court (as *Casey* and the Court's other abortion cases command) the majority dips a toe and recoils. Speaking vaguely of "inconveniences," Maj. Op. at 7, "logistical challenges," *id.* at 8, and "increased costs," *id.*, but shirking the specifics that the district court explored in exhaustive depth, the majority improvises a sanitized account of the record free of uncomfortable realities. In whitewashing the record, the majority has crystalized what has been clear at least since it agreed to hear this case initially en banc without a principled basis: this case was dead on arrival. *See Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 993 F.3d 489, 490–92 (6th Cir. 2021) (en banc) (Moore, J. dissenting from the grant of initial hearing en banc). An honest look at the record compels but one conclusion: a law that peddles in stigma, forces women into unnecessary and invasive surgical procedures, and forces low-income women to sacrifice basic necessities for themselves and their families in order to obtain an abortion is nothing if not an undue burden. I dissent.

**I.**

I do not share the majority's antipathy for the factual record, and so I begin with an overview of the evidence compiled over the course of five years of litigation and a four-day bench trial. The record—contrary to the majority's threadbare insistence—differs materially from the "sparse" record established in *Casey*, *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 372 (6th Cir. 2006), where the Court upheld Pennsylvania's 24-hour abortion waiting period.

## A.

First, some background.

Enacted in 2015, Tennessee Code Annotated § 39-15-202(a)–(h) imposes informational and temporal requirements on women seeking an abortion in Tennessee. These requirements are asserted to "ensure" that the woman's "consent for an abortion is truly informed consent." Tenn. Code Ann. § 39-15-202(b). Plaintiffs do not challenge on appeal the statute's informational component, which requires a physician "orally and in person" to inform the woman seeking an abortion of, inter alia, the fact that she is pregnant, the probable gestational age of the fetus, resources available should the woman choose not to obtain an abortion, and the risks associated with abortion or carrying the fetus to term. Tenn. Code Ann. § 39-15-202(b)–(c). Rather, Plaintiffs challenge the temporal component, a 48-hour waiting period that begins when the woman receives the mandated information. Tenn. Code Ann. § 39-15-202(d)(1). Because the woman must receive the statutorily mandated information in person, the effect of the waiting period is that a woman seeking an abortion in Tennessee must make at least two visits to the clinic where she will receive abortion care.[2]

The vast majority of abortions in Tennessee occur at outpatient clinics, with a minority—less than five percent—taking place in hospitals or individual obstetrician/gynecologist ("OB/GYN") offices. *See* R. 222 (Trial Transcript ("T.T."), Vol. IV, Lefler Test. at 82–83) (Page ID #5291–92). As of October 3, 2019, there were eight abortion providers in Tennessee (excluding hospitals and OB/GYN offices): Bristol Regional Women's Center (Bristol, TN); Carafem (Mount Juliet, TN, just outside of Nashville); Knoxville Center for Reproductive Health (Knoxville, TN); Memphis Center for Reproductive Health ("Choices") (Memphis, TN); and four offices of Planned Parenthood of Tennessee and Northern Mississippi ("PPTNM")

---

[2]The statute's requirements apply to all abortions in Tennessee, except in cases of medical emergency that prevent compliance. *See* Tenn. Code Ann. § 39-15-202(a)–(d). The statute further provides that the waiting period is to become 24 hours in the event that a court holds the 48-hour waiting period unconstitutional. *Id.* at § 39-15-202(d)(2). The district court concluded that the waiting period is unconstitutional whether 24 or 48 hours, *see Adams & Boyle*, 494 F. Supp. 3d at 569–70, and the parties appear to agree that the burdens imposed by the law (and its purported benefits) are materially similar under either duration. I agree that, based on the record before us, the length of the waiting period does not materially change the undue-burden analysis, and so I do not independently analyze the two durations.

(Knoxville, TN, Nashville, TN, and two in Memphis, TN). *See Adams & Boyle*, 494 F. Supp. 3d at 543–44.**[3]** As a result of the distribution of Tennessee's abortion clinics, "[n]inety-six percent of Tennessee counties do not have an abortion clinic, and 63% of women live in a county without an abortion provider." *Id.* at 563. Together, Plaintiffs operate six of the eight abortion facilities in Tennessee.

There are two procedures for terminating a pregnancy. The first is a "medication abortion" and involves taking a mifepristone pill at the abortion provider's office and then taking a second pill, misoprostol, at home, up to 48 hours later. R. 219 (T.T., Vol. I, Wallett Test. at 39) (Page ID #4532). A medication abortion does not require sedation and is similar to the experience of an early miscarriage. *Id.* at 40 (Page ID #4533). The second is a "surgical abortion" and generally involves an aspiration procedure that facilitates the removal of the contents of the uterus. *Id.* The procedure becomes more complex, requires "additional skills and equipment," and may require sedation as the pregnancy progresses. *Id.* at 40–41 (Page ID #4533–34). For example, a surgical abortion that takes place sixteen or seventeen weeks from the first day of the woman's last menstrual period ("LMP") is typically a two-day procedure, requiring the woman to come in on the first day for a medication to "prepare her cervix for the abortion" before returning the next day to undergo the procedure. *Id.* at 42 (Page ID #4535). Both procedures are "very safe," but the risks associated with abortion increase with gestational age. *See id.* at 40–43 (Page ID #4533–36).

Unsurprisingly, women "strongly prefer[]" medication abortions—which are shorter, less invasive, and less painful—over surgical abortions. *Id.* at 43 (Page ID #4535). However, a medication abortion is available only up to ten weeks LMP in Tennessee. *Id.* at 39–40 (Page ID #4532–33). In contrast, surgical abortions are available later in the pregnancy, at LMP cutoffs that vary by clinic. For example, PPTNM offers surgical abortions in one of its Memphis locations and its Nashville location up to 19 weeks and six days LMP. *Id.* at 38, 41–42 (Page ID

---

**[3]**PPTNM was formed in 2018 when Planned Parenthood Greater Memphis Region ("PPGMR") merged with Planned Parenthood of Middle and East Tennessee ("PPMET"). R. 219 (T.T., Vol. I, Wallett Test. at 32–33) (Page ID #4525–26). Prior to the merger, PPGMR operated the two Memphis clinics now run by PPTNM and PPMET operated the Knoxville and Nashville clinics now run by PPTNM. *Id.* For ease of reference, I will refer to these clinics as part of PPTNM, even when referring to evidence regarding the operation of the clinics prior to the merger.

#4531, 4534–35).  Choices, in Memphis, offers surgical abortions up to 15 weeks LMP.  R. 219 (T.T., Vol. I, Terrell Test. at 246) (Page ID #4739).  Only five of Tennessee's eight abortion clinics offer surgical abortions, and PPTNM's Memphis and Nashville locations are the only ones in Tennessee that offer surgical abortions past 15 weeks LMP.  *See Adams & Boyle*, 494 F. Supp. 3d at 562–63.  Although the total number of abortions in Tennessee declined between 2013 and 2017, the share of abortions occurring after 10 weeks LMP (i.e., surgical abortions) increased.  R. 222 (T.T., Vol. IV, Lefler Test. at 68–71, 74) (Page ID #5277–80, 5283).

**B.**

At trial, Plaintiffs presented seven affirmative witnesses and other documentary evidence in support of their argument that Tennessee's 48-hour abortion waiting period unduly burdens abortion access in Tennessee.  Consistent with *Whole Woman's Health*, 136 S. Ct. at 2309–10, which describes *Casey*'s undue-burden standard as calling for courts to balance an abortion restriction's benefits and burdens, Plaintiffs' affirmative case had two major prongs: (1) undermining the assertion that Tennessee's abortion waiting period ensures informed consent (i.e., showing that the law lacks any meaningful benefit) and (2) demonstrating that the law, while not benefitting its stated cause, imposes severe burdens on women seeking an abortion in Tennessee.

**1.**

The first cornerstone of Plaintiffs' trial strategy was to undermine Tennessee's statutory rationale for implementing the 48-hour waiting period:  ensuring that "consent for an abortion is truly informed consent."  Tenn. Code Ann. § 39-15-202(b).  To do so, Plaintiffs presented witnesses with knowledge of the clinics' informed-consent procedures prior to the enactment of § 39-15-202(a)–(h) and the testimony of Professor Kenneth Goodman, an expert in medical ethics and informed consent from the University of Miami.  According to Professor Goodman, informed consent in the medical context generally requires ensuring that (1) the patient is given information about the procedure or treatment, (2) the patient is competent to consent to or refuse treatment, and (3) coercion has not been employed to obtain assent.  R. 219 (T.T. Vol. I, Goodman Test. at 169) (Page ID #4662).

Plaintiffs' fact witnesses testified that their clinics each employed materially similar informed-consent procedures prior to the enactment of § 39-15-202(a)–(h). Dr. Sarah Wallett, formerly the chief medical officer at PPTNM, explained that "[a]s a physician, it's [her] ethical obligation to make sure patients understand any procedure that they're undergoing" and that Planned Parenthood's mission includes ensuring that "patients . . . have all information available to them to make informed choices." R. 219 (T.T. Vol. I, Wallett Test. at 51) (Page ID #4544). Thus, even prior to the enactment of Tennessee's waiting-period law, patients would meet for 30 minutes with trained "patient educators" to discuss their options, information about abortion, and available resources like counselling. *Id.* at 48–49 (Page ID #4541–42). Not only that, but the patient educator would also screen the patient for coercion and would ask whether they were being pressured to have an abortion. *Id.* at 49–50, 52 (Page ID #4541–42, 4545). After meeting with the patient educator, the patient would meet with her physician to answer any questions, address any concerns, "assure[] that the patient was firm in her choice to have an abortion," and "confirm informed consent for the procedure and that the patient understood the risks, benefits, and all the alternatives of proceeding." *Id.* at 50–51 (Page ID #4543–44). If a patient was unsure about having an abortion, they were encouraged to take their time with the decision and have the procedure at a later time if they chose to. *Id.* at 59, 70–71 (Page ID #4552, 4563–64).

Dr. Jessica Young, an OB/GYN at PPTNM working primarily at its Nashville and Knoxville clinics, testified that prior to the enactment of § 39-15-202(a)–(h), PPTNM's Nashville and Knoxville clinics employed a similar procedure to its Memphis clinics, which included screening patients for decisional certainty and possible coercion. R. 220 (T.T., Vol. II, Young Test. at 69) (Page ID #4861). Rebecca Terrell, executive director of Choices, testified that prior to the enactment of § 39-15-202(a)–(h), Choices employed a similar patient intake and counseling procedure to the one at PPTNM's four clinics. *See* R. 219 (T.T., Vol. I, Terrell Test. at 254–58) (Page ID #4747–51). According to Terrell, Choices's "standard practice [was] that if a patient showed any reservation, they didn't get a procedure that day." *Id.* at 261 (Page ID #4754). Finally, Plaintiffs presented deposition testimony from Dr. Wesley T. Adams, who was an OB/GYN at Adams & Boyle, P.C., which is now operated by Bristol Regional Medical Center. Dr. Adams testified that Adams & Boyle followed an informed consent procedure similar to PPTNM and Choices even before Tennessee enacted § 39-15-202(a)–(h). R. 216-1

(Adams Dep. at 35–39) (Page ID #4113–17).  Dr. Adams testified that "[a]s soon as we hear[d] that someone d[idn't] want to [have an abortion], we [would] tell them to leave immediately, and our policy [was] to make them wait at least 24 hours."  *Id.* at 121–22 (Page ID #4199–4200). Thus, at each of Plaintiffs' clinics, there were procedures in place to ensure that patients received detailed and accurate information about abortion, were competent to consent to the procedure, and were not being coerced into having an abortion or otherwise unsure about their decision. The clinics' procedures stayed largely the same after Tennessee enacted its waiting-period requirement (except, of course, that patients were required to come back for a second appointment to undergo their procedure).  *See, e.g.*, R. 219 (T.T., Vol. I, Wallett Test. at 60–61) (Page ID #4553–54).

After reviewing Plaintiffs' informed-consent procedures, Professor Goodman concluded that the procedures were "adequate and exemplary" prior to the enactment of Tennessee's waiting-period law, which Professor Goodman concluded "has impeded the consent process." R. 219 (T.T. Vol. I, Goodman Test. at 197–98) (Page ID #4690–91).  In Dr. Goodman's opinion, § 39-15-202(a)–(h) is unnecessary because Tennessee law already obliged physicians to ensure that their patients gave informed consent for treatment.  *Id.* at 189 (Page ID #4682).  He further testified that Tennessee's waiting-period law undermines patient "autonomy" for patients who "understand and appreciate the risk" by delaying their procedure, which Professor Goodman deemed "insulting and patronizing."  *Id.* at 161, 181 (Page ID #4654, 4674).  In fact, Professor Goodman opined that § 39-15-202(a)–(h) "undermin[es] the very idea of the informed-consent process" by adding procedures and delay that are unnecessary for ensuring informed consent.  *Id.* at 161–62 (Page ID #4654–55).  Noting the lack of similar laws for non-abortion procedures, Professor Goodman opined that "[t]here's nothing ethically distinctive about the role of consent when it comes to abortion."  *Id.* at 193 (Page ID #4686).  Professor Goodman was unaware of "any benefits to delaying medical care to patients who have already provided valid consent."  *Id.* at 188 (Page ID #4681).

**2.**

Plaintiffs complemented the evidence undermining the statutory purpose of Tennessee's 48-hour abortion waiting period with evidence that the law imposes severe burdens upon women

seeking an abortion in Tennessee.  In particular, Plaintiffs provided evidence proving that the law imposes severe logistical, financial, medical, and psychological burdens, especially upon the vast majority of women seeking an abortion in Tennessee who qualify as low income.

Professor Sheila Katz, a sociologist at the University of Houston, who specializes in gender and poverty, testified that, nationally, 75 percent of women seeking an abortion qualify as low-income.  R. 220 (T.T., Vol. II, Katz Test. at 226–27) (Page ID #5018–19).  Defining "low-income" as anyone under 200 percent of the federal poverty line, Professor Katz testified that low-income families are "still poor" and struggle "to meet all of the basic needs of the household" such as "adequate and safe housing, pay[ing] all of their utilities, [and] mak[ing] sure the family has nutritious food, healthcare, [and] transportation."  *Id.* at 215 (Page ID #5007).  Whereas unexpected expenses might be inconvenient for others, the expenses associated with an unintended pregnancy upend "the already . . . precarious balance that [low-income women are] trying to maintain to not be evicted, to not have utilities shut off, to make sure the children have food and basic medical needs met."  *Id.* at 229–30 (Page ID #5021–22).  Even an unexpected $50 expense can cause women that qualify as low income to forgo food.  *Id.* at 244 (Page ID #5036).  Professor Katz testified that the price of an abortion is compounded by the cost of gas or transportation, lodging, and lost wages, and that, because two-thirds of women seeking abortion in Tennessee are already mothers, they must arrange for childcare, which may add to the cost.  *Id.* at 227–28, 233–43 (Page ID #5019–20, 5025–35).  According to Professor Katz, without access to a private vehicle or public transportation, many low-income women have difficulty accessing abortion in Tennessee or must allocate financial resources for travel that they cannot afford.  *Id.* at 229–34 (Page ID #5021–26).  Professor Katz testified further that low-income women generally work jobs that do not provide paid time off and that women working these jobs risk losing them (and further damaging their already sensitive financial circumstances) if they request time off because they are "often seen as disposable."  *Id.* at 242 (Page ID #5034).  Summing up her testimony, Professor Katz opined that low-income women may not be able to access abortion at all in Tennessee because of the procedure's associated costs, and those that could raise the funds did so at "grave risk" to their ability to provide for themselves or their families.  *Id.* at 256–57 (Page ID #5048–49).

The testimony of Dr. Wallett, Dr. Young, Dr. Adams, and Terrell reinforced Dr. Katz's testimony. Consistent with national numbers, 60 to 80 percent of their patients qualify as low income and struggle to access abortion because of financial and logistical constraints caused by Tennessee's waiting-period law. *See, e.g.*, R. 220 (T.T., Vol. II, Young Test. at 91) (Page ID #4883) (60 to 70 percent of patients at PPTNM's Nashville and Knoxville clinics live close to or below the poverty line); R. 219 (T.T., Vol. I, Terrell Test. at 287–88) (Page ID #4780–81) (Approximately 80 percent of Choices patients fall below 110 percent of the federal poverty line). And each testified that their clinics increased prices for an abortion because of the waiting-period law, which effectively doubled the number of appointments they needed to accommodate, creating a need for additional hours and staffing. For example, Terrell testified that in response to the added appointments caused by the waiting period, Choices has had to increase staffing and take other measures, which has led to the price for an abortion nearly doubling between 2013 and 2019. R. 219 (T.T., Vol. I, Terrell Test. at 275–76) (Page ID #4768–69). These price increases were a "huge barrier" for the predominantly low-income population that Choices serves. *Id.* at 276 (Page ID #4769); *see also* R. 219 (T.T., Vol. I, Wallett Test. at 91) (Page ID #4584); R. 216-1 (Adams Dep. at 127–28, 142) (Page ID #4205–06, 4220). Dr. Young testified further that the costs of obtaining an abortion—not just the service itself, but also travel, childcare, and lost wages—are so significant for PPTNM's low-income patients, that to cover the costs they will "have to make trade-offs, and sometimes that's a trade-off with food, [or] other bills that they go behind on paying, whether it's rents or . . . car payments." R. 220 (T.T., Vol. II, Young Test. at 92–93 (Page ID #4884–85).

Plaintiffs pointed to further burdens, too. Dr. Young testified that the limited number of abortion providers in Tennessee restricted abortion access before Tennessee implemented its waiting-period law, but the law caused further strain because the need for more appointment slots increased wait times for a first appointment at the clinics from under one week to between one and three weeks and wait times of up to four additional weeks for the second appointment. *Id.* at 90–91, 97–98 (Page ID #4882–83, 4889–90). As a result, Dr. Young witnessed an increase in gestational age for abortions, a decrease in the number of medication abortions, and an increase in second-trimester abortions. *Id.* at 108–10 (Page ID #4900–02). This increase in surgical and second-trimester abortions was significant because they are riskier and more

painful, and because "women with a sexual history of trauma find pelvic exams [for a surgical abortion] traumatizing." *Id.* at 61–63, 113 (Page ID #4853–55, 4905). Like Dr. Young, Dr. Wallett testified that since Tennessee enacted its waiting-period law, wait times for appointments at PPTNM's Memphis clinics increased from about one- to two-weeks to three- to four-weeks, with an additional one- to two-week wait for the second appointment, despite efforts to increase hours and staffing. R. 219 (T.T., Vol. I, Wallett Test. at 72–74) (Page ID #4565–67). These delays caused patients to miss the deadline for a medication abortion, and, in some cases, the clinic's deadline for a surgical abortion entirely. *See id.* at 75–76 (Page ID #4567–68). Terrell testified that Tennessee's 48-hour waiting period has caused some Choices patients to miss Choices's 15-week LMP deadline for surgical abortions. R. 219 (T.T., Vol. I, Terrell Test. at 288–89) (Page ID #4781–82). For example, between December 1, 2017 and December 31, 2018, Tennessee's abortion waiting period caused 41 Choices patients to miss the deadline for medication abortions and 14 to miss the deadline for surgical abortions. *Id.* at 289–90 (Page ID #4782–83). These patients were "incredibly distraught" to have missed the deadlines. *Id.* at 291–92 (Page ID #4784–85).

On top of the logistical, financial, and medical burdens identified above, Plaintiffs presented evidence of the stigmatic effect of Tennessee's abortion waiting period by way of Professor Sara McClelland, a professor of psychology and women's studies at the University of Michigan. Relying on peer-reviewed studies, her own research, and other evidence, Professor McClelland opined that Tennessee's waiting-period law "exacerbates existing stereotypes about women and . . . contributes to the stigmatization of women." R. 220 (T.T., Vol. II, McClelland Test. at 177) (Page ID #4969). According to Professor McClelland, the waiting-period law "lend[s] the authority of the law to exacerbate existing stereotypes of women as irrational or overly emotional, and . . . by exacerbating these stereotypes, . . . could both affect how people think about women more broadly, as well as how women think about themselves as incapable of making their own healthcare decisions." *Id.* at 178 (Page ID #4970). In Professor McClelland's opinion, Tennessee's waiting-period law "causes harm both in that people have increased stereotypes around women as incapable decision-makers, and . . . in that it teaches women to think of themselves as incapable decision-makers." *Id.* at 188 (Page ID #4980). "[I]n essence," Professor McClelland testified, the law tells a woman seeking an abortion "that her own decision

of her own healthcare is insufficient," thereby "demean[ing] her by insisting that she herself is not the arbiter of her own healthcare." *Id.* at 188–89 (Page ID #4980–81). According to Professor McClelland, ongoing stigmatization like that caused by Tennessee's waiting-period law is detrimental to a woman's physical and psychological health. *Id.* at 189 (Page ID #4981).

## C.

Tennessee's own trial strategy largely eschewed any attempt to rebut Plaintiffs' evidence of the burdens imposed by § 39-15-202(a)–(h)'s 48-hour waiting period. Instead, Tennessee sought to rehabilitate the waiting period's purported benefits with two witnesses who testified that the waiting period improves women's decisional process and reduces the risk of post-abortion regret and guilt. Plaintiffs presented witnesses of their own in rebuttal.

The first of Tennessee's witnesses was Professor Priscilla K. Coleman of Bowling Green State University. Professor Coleman, a psychology professor, testified that the waiting period "enables time for women to make [the decision to have an abortion] in a way that is fully informed." R. 221 (T.T., Vol. III-A, Coleman Test. at 32–33) (Page ID #5111–12). She opined, based on various studies and her own research, that "time is needed to maximize human decisional processes." *Id.* at 33 (Page ID #5112). According to Professor Coleman, the stress associated with abortion leads to decisionmaking that "tends to be more emotionally based rather than analytical, rational, thoughtful. We make more hurried decisions when we're under stress." *Id.* at 42 (Page ID #5121). Thus, Professor Coleman testified that it is "important for the woman to get out of that acute stress state and have time to consider her options and what's best for her as an individual." *Id.* at 37 (Page ID #5116). On cross-examination, however, Professor Coleman admitted that she does not "have research experience concerning the [psychological] process that people go through in order to make a decision" and that the studies she relied on did not "directly apply" to waiting periods of 48 hours and that it would require an "inferential leap" to apply the studies she relied on to Tennessee's 48-hour waiting period. *Id.* at 81, 107, 110–12 (Page ID #5160, 5186, 5189–91).

Professor Coleman also testified that there was a "high probability of [a woman] feeling guilty and regretting [her] abortion," with studies showing that between 25 and 75 percent of

women "feel some level of guilt after undergoing a procedure." *Id.* at 52–53 (Page ID #5131–32). But on cross-examination, Professor Coleman acknowledged that her opinion was based in part upon "a newspaper poll, not a peer-reviewed study, and . . . a survey of anonymous letters written to a pastor at a church in Florida." *Adams & Boyle*, 494 F. Supp. 3d at 535. Professor Coleman testified further that abortion can increase the risk of negative mental-health outcomes, but acknowledged that this opinion was based in part upon ten articles that she co-authored with someone she considered "too political and not good at statistics and writing" and another that she described as "too politically minded." R. 221 (T.T., Vol. III-A, Coleman Test. at 86–90) (Page ID #5165–69). Moreover, Professor Coleman herself testified that her personal view is that abortions are not beneficial except in cases of medical emergency and that in her opinion abortion should be legal only "when the woman's life is in imminent danger." *Id.* at 82 (Page ID #5161).

The second witness that Tennessee presented on this theory was Dr. Michael Podraza, an OB/GYN employed by Tenet Medical Partners in Memphis. Dr. Podraza opined that a 48-hour waiting period for abortions "is reasonable because . . . most of the time . . . most surgeries that are of any significance would be done with time between the initial consultation and the surgery." R. 222 (T.T., Vol. IV, Podraza Test. at 18) (Page ID #5227). He also opined that "there's a significant regret rate for abortion" which makes it "a good idea for patients to have time to think about that decision before they are taken to surgery." *Id.* at 18–19 (Page ID #5227–28). However, Dr. Podraza conceded that he does not perform abortions because he does not "believe in the morality of abortion" and does not prescribe "artificial contraceptives" or birth control because of his beliefs as a Catholic and because his practice "is based on the kind of a natural mindset of trying to heal the body." *Id.* at 13–14 (Page ID #5222–23). Dr. Podraza testified that he has not published articles on abortion or researched regret associated with abortion, and that he would not "perform an abortion if it was necessary to save a woman's life" because he "believe[s] there's always another option." *Id.* at 34–35, 45–46 (Page ID #5243–44, 5254–55).

In rebuttal, Plaintiffs presented first Professor Jeffrey Huntsinger, a social-psychology professor at Loyola University, Chicago. Professor Huntsinger disagreed with Professor

Coleman's opinion that a 24- or 48-hour waiting period improves decisionmaking with respect to abortion. R. 224 (T.T., Vol. 3-B, Huntsinger Test. at 40–42 (Page ID #5490–92). He opined that Professor Coleman—whom he did not believe to be an expert on decisionmaking—"mischaracterize[d] the literature [that she referenced in testimony] in a way that suggests that she may not actually understand the literature that she's discussing." *Id.* at 17 (Page ID #5467). For example, Professor Huntsinger explained that Professor Coleman testified that emotion negatively impacts decisionmaking even though the literature that she relied on "directly contradict[ed]" her statement. *Id.* at 17–18 (Page ID #5467–68). Indeed, Professor Huntsinger testified that Professor Coleman's sources suggest that emotion actually enhances decisionmaking, "leading us to make thoughtful, rational decisions." *Id.* Professor Huntsinger testified that, contrary to Professor Coleman's testimony, a 24- or 48-hour waiting period does not benefit decisionmaking and may lead to "suboptimal decisions." *Id.* at 20–21 (Page ID #5470–71).

Plaintiffs also presented Antonia Biggs, Ph.D., in rebuttal, a reproductive-health researcher at the University of California, San Francisco, who testified that the scientific literature contradicts Professor Coleman's testimony regarding negative mental-health outcomes associated with abortion. R. 222 (T.T., Vol. IV, Biggs Test. at 95) (Page ID #5304). According to Dr. Biggs, "there is a lot of data on this topic" that taken together "clearly shows that abortion does not increase women's risk of . . . experienc[ing] negative mental health outcomes." *Id.* Although Dr. Biggs acknowledged that some women will regret their abortion, regret is uncommon, and there is no evidence suggesting that a waiting period of 24- or 48-hours would reduce the number of women who regret having an abortion. *Id.* at 95–96, 223–24 (Page ID #5303–04, 5432–33). More broadly, Dr. Biggs testified that the "general consensus within the scientific community" is that abortions do not increase the likelihood of negative mental-health outcomes. *Id.* at 104 (Page ID #5313). As to Professor Coleman's claims that women deciding whether to have an abortion have high rates of decisional uncertainty, Biggs pointed to studies finding that 95 percent of women were certain of their decision when they first arrived at a clinic and another study finding that "the vast majority" of women are certain of their decision when they receive abortion care. *Id.* at 133–34 (Page ID #5342–43). Plaintiffs' affirmative witnesses bolstered the testimony of Professor Huntsinger and Dr. Biggs, testifying that their patients

exhibited decisional certainty between 96 and 99 percent at their first appointments. *See, e.g.*, R. 219 (T.T., Vol. I, Wallett Test. at 57) (Page ID #4550); R. 220 (T.T., Vol. II, Young Test. at 78–79) (Page ID #4870–71).

**D.**

After considering the witnesses' testimony, the district court found "fully credible" and gave "great weight" to the testimony of Dr. Wallett, Dr. Young, Dr. Adams, Terrell, Professor Goodman, Professor McClelland, Professor Katz, Professor Huntsinger, and Dr. Biggs. *Adams & Boyle*, 494 F. Supp. 3d at 505, 509, 513, 524, 527, 531, 541, 551, 555, 561. The district court found differently, however, about Professor Coleman, whose testimony it found "not credible and not worthy of serious consideration." *Id.* at 538. As for Dr. Podraza, the district court found that it was "unable to accord Dr. Podraza's testimony, which is largely irrelevant to the issues the Court must decide, any significant weight." *Id.* at 543.

Cataloging the evidence of the logistical, financial, and medical hurdles created by Tennessee's waiting-period law and its stigmatic effects, the district court concluded that the law severely burdened abortion access in Tennessee. *Id.* at 562–65. As for the waiting period's benefits, the district court found none, crediting the evidence establishing that the vast majority of women are certain of their decision to have an abortion when they attend their first appointment and noting the lack of evidence suggesting that a waiting period improves decisional certainty for the small minority of women who were not certain at the time of their first appointment. *Id.* at 557–62. Thus, the district court found that the law's burdens far outweighed its purported benefits under *Whole Woman's Health*, held that Tennessee's waiting period for abortions unduly burdened abortion access in Tennessee, declared the statute's waiting period unconstitutional, and permanently enjoined its enforcement. *Id.* at 565–67, 569–70.[4]

This appeal followed, with a few conspicuous diversions. After the district court denied Tennessee's motion for a stay pending appeal, the state sought the same relief in this court. The

---

[4]Plaintiffs brought two claims targeting Tennessee's abortion waiting period. After deciding the first—grounded in substantive due process—in Plaintiffs' favor, the district court declined to decide the second, an equal-protection claim, reasoning that Plaintiffs had obtained all of their requested relief by way of the district court's ruling on their first claim. Plaintiffs do not address their equal-protection claim here; only their substantive-due-process claim is the subject of this appeal.

assigned panel denied Tennessee's motion for a stay pending appeal, over a dissent by Judge Thapar that called for Tennessee to seek en banc review. *Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 988 F.3d 329, 344 (6th Cir.) (Thapar, J., dissenting), *vacated*, 994 F.3d 774 (6th Cir. 2021). Tennessee followed Judge Thapar's advice and filed a petition for initial hearing en banc or rehearing en banc of their earlier motion for a stay pending appeal. A majority of the en banc court voted to hear the case initially en banc, superseding initial panel review. *Bristol Reg'l Women's Ctr.*, 993 F.3d 489. I dissented and continue to believe that the majority's decision to hear this case initially en banc "lacks a principled basis and tarnishes this court's reputation for impartiality and independence." *Id.* at 490 (Moore, J., dissenting from the grant of initial hearing en banc). Soon after agreeing to hear the case initially en banc, the majority granted Tennessee's renewed motion for a stay pending appeal. *Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 994 F.3d 774, 775 (6th Cir. 2021).

## II.

The best that can be said of this court's misguided decision to hear this case initially en banc is that it streamlines the analysis somewhat. No longer encumbered by our earlier decisions—whether issued by prior panels or the en banc court—we are now tasked with applying Supreme Court precedent free of the repressive veneer that this court has recently attempted to lacquer over the Court's decisions. *See, e.g.*, *Preterm-Cleveland v. McCloud*, 994 F.3d 512 (6th Cir. 2021) (en banc); *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418 (6th Cir. 2020). Like the majority's presentation of the facts, the majority's reading of the Court's abortion precedent leaves much to be desired. Thus, I find it necessary to offer a more faithful explanation of the Court's abortion precedent before applying the undue-burden standard to the factual record before us.

### A.

In *Casey*, the Court confirmed the fundamental right of a woman to choose to terminate her pregnancy—to have an abortion—before the point of viability. 505 U.S. at 871 ("The woman's right to terminate her pregnancy before viability is the most central principle of *Roe v. Wade*. It is a rule of law and a component of liberty we cannot renounce.").

Rejecting fervent calls to overrule *Roe v. Wade* in full, the Court reasoned that matters, like abortion, "involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment." *Id.* at 851. In part, the Court's decision not to overturn all of *Roe* rested on stare decisis grounds, given that *Roe* had been on the books for nearly twenty years. *Casey*, 505 U.S. at 854, 869. But the case also unmistakably endorsed the exalted ideals embodied by the Court's earlier abortion jurisprudence. For one, the Court embraced the premise that "[t]he destiny of the woman must be shaped to a large extent on her own conception of her spiritual imperatives and her place in society," not the State's "own vision of the woman's role, however dominant that vision has been in the course of our history and our culture." *Id.* at 852. Later, the Court explained that although "[t]here was a time, not so long ago, when a different understanding of the family and of the Constitution prevailed," those views, "of course, are no longer consistent with our understanding of the family, the individual, or the Constitution." *Id.* at 896–97. Recognizing that "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives," the Court reaffirmed the central tenet of *Roe*. *Id.* at 856. The decision in *Casey* is an ode to the abortion right and its centrality to women's equal participation in all that is life in this country.

In reaffirming the right of a woman to terminate her pregnancy before viability, however, the Court set aside the trimester framework that in *Roe* it had established for analyzing the constitutionality of abortion restrictions. As the Court explained the trimester framework in *Casey*,

> almost no regulation at all is permitted during the first trimester of pregnancy; regulations designed to protect the woman's health, but not to further the State's interest in potential life, are permitted during the second trimester; and during the third trimester, when the fetus is viable, prohibitions are permitted provided the life or health of the mother is not at stake.

*Id.* at 872. The Court's primary criticism of the trimester framework was that it failed properly to account for the State's "interest in potential life," an interest that the Court had acknowledged in *Roe*. *See Casey*, 505 U.S. at 873, 875–76. Analogizing to the right to vote—where the State's

interest in regulating elections affords the State the ability to implement regulations that incidentally burden the right to vote—the Court sought to replace *Roe*'s rigid trimester framework with a more flexible standard that better balanced the woman's right to choose to terminate her pregnancy before viability with the State's interests in protecting the health of the mother and in potential life. *Id.* at 873–74 (citing *Anderson v. Celebrezze,* 460 U.S. 780, 788 (1983)).

To the Court, "the undue burden standard [was] the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty." *Id.* at 876. Setting forth the standard it envisioned, the Court explained that "[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877. Under the undue-burden standard,

> the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.

*Id.* Thus, "[r]egulations which do no more than create a structural mechanism by which the State . . . may express profound respect for the life of the unborn are permitted," but only "if they are not a substantial obstacle to the woman's exercise of the right to choose." *Id.* Likewise, "[r]egulations designed to foster the health of a woman seeking an abortion are valid if they do not constitute an undue burden." *Id.* at 878. This standard preserves the state's "interest in potential life" and its interest in protecting the health of the mother, but only to the extent that the restrictions expressing those interests do not run afoul of the undue-burden standard. *Id.*

In applying its undue-burden standard in *Casey*, the Court demonstrated the standard's fact-intensive design. First, the Court considered Pennsylvania's "informed consent requirement," which imposed a 24-hour waiting period for abortions, beginning once a physician provided the woman with information regarding the procedure, its health risks, and the gestational age of the fetus. *Id.* at 881. Assessing first the statute's informational component, the Court held that it did not unduly burden the abortion right, reasoning that "[i]f the

information the State requires to be made available to the woman is truthful and not misleading, the requirement may be permissible." *Id.* at 882.  But the Court had more difficulty with the law's 24-hour waiting period.  Accepting that such a waiting period "*[i]n theory . . . does not amount to an undue burden,*" the Court went on to examine whether the waiting period amounted to a substantial obstacle "*in practice*" based on the district court's "findings of fact." *Id.* at 885–86 (emphases added).  Calling it a "closer question," the Court concluded that the delay and increased costs associated with the waiting period were "troubling," but did not amount to a substantial obstacle, even for those—like poor women or those who lived farthest from clinics—for whom the burden was the most significant. *Id.* at 886.  The Court was careful, however, to note that its conclusion was based on "the record before [it]," *id.* at 887, a record that this court has since characterized as "sparse," *Taft*, 468 F.3d at 372.  Notably, upholding Pennsylvania's informed-consent requirements meant overruling cases where the Court had invalidated similar requirements under *Roe*'s trimester framework:  *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 442 (1983), and *Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 760 (1986).  *Casey*, 505 U.S. at 882.

Turning to Pennsylvania's spousal-consent requirement—which prohibited physicians from performing an abortion "on a married woman without receiving a signed statement from the woman that she has notified her spouse that she is about to undergo an abortion"—the Court held the provision to be unduly burdensome. *Id.* at 887, 893–95.  Cataloging the district court's "detailed" factual findings on spousal abuse and domestic violence (supported by myriad studies regarding the same), the Court concluded that the requirement amounted to a substantial obstacle for "the significant number of women who fear for their safety and the safety of their children" if they were to inform an abusive husband of their decision to have an abortion. *Id.* at 888, 893–94. In holding Pennsylvania's spousal-consent requirement facially invalid, the Court clarified the framework for assessing facial invalidity, which requires courts to determine whether the abortion restriction in question operates as a substantial obstacle "in a large fraction of the cases in which [the restriction] is relevant." *Id.* at 895.  Under this standard, "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* at 894.  In terms of the spousal-notification requirement, the law was irrelevant for those married women who in the absence of the law would still have notified their

spouse of their intention to have an abortion but operated as a restriction for those women who would not have so informed their spouse. *Id.* at 894–95. Without undertaking a detailed mathematical analysis, the Court held that the spousal-notification requirement operated as a substantial obstacle for a large fraction of women in the latter category, sufficient to render the law facially invalid. *Id.* at 895.

Setting forth its comprehensive framework for addressing the constitutionality of abortion restrictions, the Court acknowledged the limitations of its ruling in *Casey*: "Even when jurists reason from shared premises, some disagreement is inevitable. That is to be expected in the application of any legal standard which must accommodate life's complexity. We do not expect it to be otherwise with respect to the undue burden standard." *Id.* at 878 (citations omitted). The Court's prediction proved prescient.

**B.**

Fast forward some twenty years from *Casey* and disagreement had arisen as to the proper application of the undue-burden standard. In *Whole Woman's Health*, a majority of the Court remedied that disagreement by clarifying that the undue-burden standard "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." 136 S. Ct. at 2309 (citing *Casey*, 505 U.S. at 887–901). Applying this "balancing" test, *id.*, to Texas laws requiring that an abortion provider have admitting privileges at a hospital within thirty miles of its facility and that its facility meet the minimum standards for surgical centers under state law, the Court held that the laws were invalid, *id.* at 2300. As for the admitting-privileges law, the Court concluded that it unduly burdened abortion access because its burdens—the law would have closed about half of the state's existing abortion facilities, increasing wait time, crowding, and the distance women needed to travel in order to receive an abortion—outweighed its benefits, which were essentially nonexistent given the evidence demonstrating that abortion complications requiring hospitalization are exceedingly rare. *Id.* at 2313–14. As for the surgical-center requirement, the Court concluded that it unduly burdened abortion access because it would further reduce the number of abortion providers in the state to the point where the remaining facilities would be unable to meet the existing demand for abortion services, and again because it offered no meaningful health benefits. *Id.* at 2314–18.

The waters muddied again, however, with the Court's splintered decision in *June Medical Services L.L.C. v. Russo*, 140 S. Ct. 2103 (2020).  Addressing a Louisiana admitting-privileges law that was nearly identical to the Texas law invalidated in *Whole Woman's Health*, a four-justice plurality faithfully balanced the burdens and benefits of the Louisiana law and concluded that it unduly burdened abortion access in violation of the Due Process Clause.  *Id.* at 2112–13 (plurality op.).  As the plurality explained, the case was "nearly identical" to *Whole Woman's Health*:  the Louisiana law would reduce the number and geographic distribution of abortion clinics, increasing travel time, costs, and the wait time for the procedure, all without any corresponding benefit.  *Id.* at 2121–22, 2130–31, 2133 (plurality op.).  After holding the Louisiana admitting-privileges law unconstitutional, the plurality addressed the argument that the law "would not make it 'nearly impossible' for a woman obtain an abortion," and rejected it: "the words 'nearly impossible' do not describe the legal standard that governs."  *Id.* at 2133 (plurality op.).  As the plurality went on to explain, "[s]ince *Casey*, [the Court has] repeatedly reiterated that the plaintiff's burden in a challenge to an abortion regulation is to show that the regulation's 'purpose or effect' is to 'plac[e] a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'"  *June Medical*, 140 S. Ct. at 2133 (plurality op.) (second alteration in original) (quoting *Casey*, 505 U.S. at 877).

The Chief Justice concurred, but on stare decisis grounds.  Noting the need to "treat like cases alike," and the almost identical district-court records in *Whole Woman's Health* and *June Medical*, the Chief Justice explained that he could not help but follow *Whole Woman's Health* (despite his conviction that the case was wrongly decided):

> *Stare decisis* instructs us to treat like cases alike.  The result in this case is controlled by our decision four years ago [in *Whole Woman's Health*] invalidating a nearly identical Texas law.  The Louisiana law burdens women seeking previability abortions to the same extent as the Texas law, according to factual findings that are not clearly erroneous.  For that reason, I concur in the judgment of the Court that the Louisiana law is unconstitutional.

*June Medical*, 140 S. Ct. at 2133–34, 2141–42 (Roberts, C.J., concurring in the judgment).  The Chief Justice took a moment, however, to criticize the balancing test employed by the plurality (and the majority in *Whole Woman's Health*) as untethered from *Casey*.  *Id.* at 2135–39 (Roberts, C.J., concurring in the judgment).  According to the Chief Justice in *June Medical*, the benefits

of a law (or lack of benefits) are irrelevant to a determination of whether a state abortion restriction "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" under *Casey*. *Id.* at 2135–36 (Roberts, C.J., concurring in the judgment) (quoting *Casey*, 505 U.S. at 877). In his view, "[l]aws that do not pose a substantial obstacle to abortion access are permissible, so long as they are 'reasonably related' to a legitimate state interest." *Id.* at 2135 (Roberts, C.J., concurring in the judgment) (quoting *Casey*, 505 U.S. at 878). Four dissenting justices would have held the Louisiana admitting-privileges law constitutional.

## C.

Since *June Medical*, much ink has been spilled—in this court and others—as to the impact of the Chief Justice's solo concurrence on *Casey*'s undue-burden standard. In this circuit, a divided panel purported to resolve the issue in *EMW*, 978 F.3d 418, which involved a Kentucky law requiring that abortion providers obtain transfer and transport agreements with local hospitals and ambulance services. Bemoaning the "'vexing task' of deciding which opinion controls" when the Supreme Court issues a decision without a majority opinion, the *EMW* majority selected the Chief Justice's concurrence (and its rejection of a balancing approach to the undue-burden standard), reasoning that it was the narrower opinion and thus controlling under the doctrine set forth in *Marks v. United States*, 430 U.S. 188 (1977). *EMW*, 978 F.3d at 431–33. Judge Clay dissented, arguing that whatever the intricacies of *Marks* may be, the Chief Justice's side commentary on the undue-burden standard was dicta given that his vote to join the plurality and invalidate Louisiana's admitting-privileges law rested on stare-decisis principles alone—the nearly identical factual records compelled the Chief Justice to vote to invalidate the law, despite his misgivings about the *Whole Woman's Health* standard. *See id.* at 453–58 (Clay, J., dissenting); *June Medical*, 140 S. Ct. at 2139, 2141–42 (Roberts, C.J., concurring in the judgment). Judge Clay also pointed out that the majority's lengthy analysis of *Marks* was unnecessary in light of the majority's holding that the district court clearly erred in finding that the Kentucky statute would result in the closure of Kentucky's two abortion clinics (the only burden that the plaintiffs had asserted to be undue). *Id.* at 454 n.2 (Clay, J., dissenting). The Seventh Circuit has since reached a similar conclusion to Judge Clay in *Planned Parenthood of*

*Indiana & Kentucky, Inc. v. Box*, explaining that *Marks* "does not allow dicta in a non-majority opinion to overrule an otherwise binding precedent." 991 F.3d 740, 741 (7th Cir. 2021); *see also Reprod. Health Servs. v. Strange*, 3 F.4th 1240, 2021 WL 2678574, at *12 & n.6 (11th Cir. June 30, 2021) ("*Whole Woman's Health* recites the binding standard that we must apply here, and the Supreme Court's recent decision in *June Medical . . .* did not change that.").

Six months after the panel decided *EMW*, this court sitting en banc issued a heavily fractured decision in *Preterm-Cleveland*, with Judge Batchelder's lead opinion abruptly dubbing *EMW* "the controlling law of our Circuit" without further analysis. 994 F.3d at 525. Judge Clay dissented again, expounding on his analysis in *EMW* and pointing out that the *EMW* panel's analysis of *Marks* was itself dicta in light of the panel's clear-error conclusion. *Preterm-Cleveland*, 994 F.3d at 567–68 (Clay, J., dissenting). I joined Judge Clay's dissent and wrote separately to point out several flaws in the majority's reasoning. *Id.* at 552–54 & n.1 (Moore, J., dissenting). Among other things, I took issue with the lead opinion's decision not to engage in its own analysis of the *Marks* issue (after all, a panel decision like *EMW* does not bind the en banc court) or at least adopt *EMW*'s reasoning in full. *Id.* at 552–53 (Moore, J., dissenting). I concluded that the lead opinion's brusque appeal to the law of the circuit could not be reconciled with other judges' insistence that the only binding portions of an opinion are those where it is "clear that the court considered the issue and consciously reached a conclusion about it," *id.* at 553 (Moore, J., dissenting) (quoting *Wright v. Spaulding*, 939 F.3d 695, 702 (6th Cir. 2019) (Thapar, J.)).

Suffice it to say, I continue to agree with Judge Clay (and our sibling circuits) that *Whole Woman's Health* remains controlling law in its articulation of *Casey*'s undue-burden standard. The majority feels differently. Imitating its maneuver in *Preterm-Cleveland*, where the lead opinion dubbed *EMW* the law of the circuit without analysis, the majority here "set[s] forth the law" with a handful of citations to *Preterm-Cleveland*. Maj. Op. at 4–5. This time, at least, the majority deigns—albeit it in a cursory footnote—to "adopt [the] thorough analysis" of *EMW* as its own. Maj. Op. at 4 n.1. To be sure, that is better than nothing. *See Preterm-Cleveland*, 994 F.3d at 552 (Moore, J., dissenting) ("So why hide the ball and assert that the en banc court is bound by a divided panel in *EMW*? Or, *at least*, why not address and adopt *EMW*'s lengthy

reasoning in full?" (emphasis added)).  But even in doing the least, the majority cannot help but underscore the flaws in the reasoning that it has so eagerly elevated.

According to the majority, because both the joint opinion in *Casey* and the Chief Justice's opinion in *June Medical* invoke stare decisis, and no one contests that *Casey* "adjusted" the standard for analyzing abortion restrictions, there should be no difficulty concluding that the Chief Justice did the same in *June Medical*.  Maj. Op. at 4 n.1.  The majority's superficial analysis misses the point.  In *June Medical*, the Court invalidated a law nearly identical to the one that the Court had invalidated in *Whole Woman's Health* and did so on an essentially identical factual record.  It was unnecessary for the Chief Justice to "adjust" the applicable standard because that standard produced the very outcome that the Chief Justice endorsed.  His criticism of *Whole Woman's Health* was thus dicta; all that was necessary to the Chief Justice's vote to invalidate the Louisiana law at issue was a straightforward application of stare decisis—treating "like cases alike," to use the Chief Justice's turn of phrase.  *June Medical*, 140 S. Ct. at 2134, 2141 (Roberts, C.J., concurring in the judgment); *see Preterm-Cleveland*, 994 F.3d at 563–64 (Clay, J., dissenting); *EMW*, 978 F.3d at 453–58 (Clay, J., dissenting).  *Casey* is different because its adherence to precedent—its application of stare decisis—went only so far.  Unlike in *June Medical*, where the Court invalidated a law that it had (in essence) already invalidated in *Whole Woman's Health*, the Court in *Casey upheld* laws substantially similar to those that it had previously invalidated in *Akron* and *Thornburgh*.  *See supra* § II.A.

This distinction between *Casey* and *June Medical* makes all the difference.  True, the Court invoked stare decisis to uphold the central tenet of *Roe*—a woman's right to choose to terminate her pregnancy before viability—but that is where its reliance on stare decisis ended.  *Casey*, 505 U.S. at 854, 869.  For the Court to *uphold* a law that would be invalid under preexisting precedent, it must exceed the bounds of stare decisis, overrule the prior case(s), and announce the standard that explained the changed outcome.  Put in terms of *Casey*, the Court could not uphold Pennsylvania's informed-consent and waiting-period laws consistent with *Akron* and *Thornburgh* or the trimester framework that those cases applied, so the Court could hold as it did only by overruling those cases and announcing its new undue-burden standard. The same is not true of the Chief Justice's position in *June Medical*; he could (and did) vote to

invalidate the Louisiana law at issue consistent with *Whole Woman's Health*—no adjustments needed. Thus, there is nothing inconsistent about following *Casey* insofar as it announced a new framework for analyzing abortion restrictions but treating the Chief Justice's criticism in *June Medical* of the *Whole Woman's Health* standard as the dicta that it is. In *Casey*, the new standard was necessary; in *June Medical*, it was not.

As dicta, the Chief Justice's reasoning in his solo concurrence could not overrule *Whole Woman's Health*. That being the case, I maintain that the articulation of the undue-burden standard in *Whole Woman's Health* is the one that should be applied to constitutional challenges to abortion restrictions. The majority's willingness to hold otherwise is contrary to reason and yet another testament to the perils of its perfunctory analysis. As I shall now explain, however, the issue is of limited consequence here because I would hold Tennessee's abortion waiting period facially invalid under either standard.

### III.

### A.

Despite my conviction that the Chief Justice's articulation of *Casey*'s undue-burden standard does not displace *Whole Woman's Health*, I will begin as the majority does. The Chief Justice's undue-burden standard involves two inquiries. First, is the law "'reasonably related' to a legitimate state interest"? *June Medical*, 140 S. Ct. at 2135 (Roberts, C.J., concurring in the judgment) (quoting *Casey*, 505 U.S. at 878). Second, does the law have "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus"? *Id.* (quoting *Casey*, 505 U.S. at 877). Assuming, without deciding, that the law is rationally related to Tennessee's interest in potential life, I would hold that the law is nevertheless invalid because it is a substantial obstacle for at least the 60 to 80 percent of women seeking an abortion in Tennessee who qualify as low income.

At the outset, it is wrong to say or suggest that *Casey* categorically approved of all waiting-period laws when it upheld Pennsylvania's. *See* Appellant Br. at 2 (arguing that the result of this appeal is "preordain[ed]" by *Casey*); *see also Bristol Reg'l Women's Ctr.*, 988 F.3d at 344 (Thapar, J., dissenting) ("Since *Casey*, no federal appellate court has successfully struck

down an abortion waiting period. Why? Because the Supreme Court says that waiting periods are constitutional.").**5**   As explained above, the Court was careful in *Casey* to note that its conclusion was based on "the record before [it]."  *Id.* at 887.  The Court's record-before-us limitation left the door open for challenges to similar waiting periods in cases—like this one— with more substantial factual records.  Don't take my word for it, though; instead ask Justice Souter, one of *Casey*'s three authors.  Soon after *Casey*, he explained that "litigants are free to challenge similar restrictions [to those at issue in *Casey*] in other jurisdictions" given the Court's insistence that its conclusions were based on "'the record' before [it]."  *Planned Parenthood of Se. Pa. v. Casey*, 510 U.S. 1309, 1312–13 (1994) (Souter, J., in chambers) (quoting *Casey*, 505 U.S. at 884, 887, 901).  Justice O'Connor, a second of *Casey*'s three authors, has indicated her agreement on this point.  *See Fargo Women's Health Org. v. Schafer*, 507 U.S. 1013 (1993) (mem.) (O'Connor, J., concurring) ("[T]he joint opinion [in *Casey*] specifically examined the record developed in the district court in determining that Pennsylvania's informed-consent provision did not create an undue burden.  While I express no view as to whether the particular provisions at issue in this case constitute an undue burden, I believe the lower courts should have undertaken the same analysis." (internal citation omitted)); *see also Casey*, 505 U.S. at 926 (Blackmun, J., concurring in part and dissenting in part) ("The joint opinion makes clear that its specific holdings are based on the insufficiency of the record before it.  I am confident that in the future evidence will be produced to show that 'in a large fraction of the cases in which [these regulations are] relevant, [they] will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" (internal citation omitted)).

The Seventh Circuit put it well in explaining the reason why Justices Souter and O'Connor must be correct:

> [N]ot all states are like Pennsylvania.  States differ in the number of physicians who perform abortions, the number of abortion facilities, the distances women must travel in order to reach an abortion facility, and the average income of women seeking abortions.  While a twenty-four hour waiting period that requires two trips to an abortion provider has been found not to impose an undue burden on Pennsylvania women based on the circumstances of that state at the time the

---

**5**The majority here has at least stopped short of explicitly holding that *Casey* held all waiting-period laws to be categorically constitutional under the undue-burden standard.  Nevertheless, the majority's terse treatment of the record provides evidence of its intention to adopt such a rule in practical effect.

> Court decided *Casey,* a similar provision in another state's abortion statute could well be found to impose an undue burden on women in that state depending on the interplay of factors such as those identified above.

*Karlin v. Foust*, 188 F.3d 446, 485 (7th Cir. 1999) (internal citation omitted). The record before us offers a case in point. As the district court here pointed out, at the time that *Casey* was decided Pennsylvania had 81 abortion providers. Compare that to Tennessee's eight abortion clinics concentrated in just five cities in a state that is roughly the same size as Pennsylvania, and it is no surprise that, as I shall now explain, the burdens found here are materially more substantial than those found in *Casey*.[6]

*Substantial Delays*. By doubling the number of in-person appointments that abortion clinics in Tennessee needed to accommodate because of the 48-hour waiting period, § 39-15-202(a)–(h) left Tennessee's abortion clinics scrambling. Even as the clinics increased hours and

---

[6]The majority takes issue with the district court's comparison of the relative availability of abortion providers in Pennsylvania and Tennessee, insisting that it was improper for the district court to consider evidence not considered by the Supreme Court when it decided *Casey*. But Plaintiffs established the relative availability of abortion services through competent record evidence on which the district court was free to rely in making its factual findings. *See Adams & Boyle*, 494 F. Supp. 3d at 519 n.24. The district court acknowledged testimony that the Pennsylvania figure likely included types of facilities not counted in Tennessee, but nevertheless found that the evidence established that abortion services were far less available in Tennessee than in Pennsylvania when the Court decided *Casey*. *See id.* This evidence, while not dispositive, helps to explain why the burdens in this case are more severe than those established in *Casey*, and there is no reason to discount it.

Tennessee argues that, if anything, abortion is more available in Tennessee today, pointing to the district court in *Casey*, which found that "'[w]omen who live in' 62 of Pennsylvania's 67 counties 'must travel for at least one hour, and sometimes longer than three hours, to obtain an abortion from the *nearest* provider.'" Reply Br. at 15 (quoting *Planned Parenthood of Se. Pennsylvania v. Casey*, 744 F. Supp. 1323, 1352 (E.D. Pa. 1990)). This factual argument—which appears to have been made for the first time in Tennessee's reply brief on appeal—is untenable. The finding that Tennessee points to in *Casey* regarding travel time for abortions in Pennsylvania pertained only to 62 of Pennsylvania's 67 counties, leaving five counties—covering "58% of women obtaining abortions in Pennsylvania" at the time—unaccounted for. *See Casey*, 744 F. Supp. at 1352. The clear implication from the district court's findings of fact in *Casey* is that 58 percent of women seeking an abortion in Pennsylvania in 1992 could do so without significant travel. *See id.* Tennessee fails meaningfully to address this important qualification from the district court in *Casey*; indeed, rather than citing evidence regarding the accessibility of abortion in Tennessee, the state cites Judge Thapar's dissent from the denial of Tennessee's motion for a stay pending appeal in which he argued that "almost every Tennessean lives within a two-hour drive of an abortion clinic." Reply Br. at 15 (quoting *Bristol Reg'l Women's Ctr.*, 988 F.3d at 351 n.3 (Thapar, J., dissenting)). But Judge Thapar's dissent is not evidence. In light of the *actual* evidence regarding the comparative number of abortion clinics in Tennessee in 2020 and Pennsylvania in 1992, which is supported by numerous witnesses' testimony as to the long distances that women in Tennessee travel to obtain an abortion, *see, e.g.*, *Adams & Boyle*, 494 F. Supp. 3d at 504, 512, 519, it was not clear error for the district court to find that abortion was more accessible in Pennsylvania in 1992 than it is in Tennessee today, *see Taglieri v. Monasky*, 907 F.3d 404, 409 (6th Cir. 2018) (en banc) (explaining that, on clear-error review, "we leave fact finding to the district court . . . unless the fact findings 'strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.'" (quoting *United States v. Perry*, 908 F.2d 56, 58 (6th Cir. 1990))).

staffing, they were unable to supply enough appointments for women to be seen timely for their first appointments or be seen in 48 hours for their second appointment. *See, e.g.*, *Adams & Boyle*, 494 F. Supp. 3d at 504–05, 513, 524, 555. Compounding the clinic-side delays, women forced to return for a second appointment—especially low-income women—faced delays from the time it takes to raise funds for the procedure, inflexible work schedules, arranging childcare, and facilitating transportation. *See, e.g.*, *id.* at 512, 518–19, 562–63.

The result? With Tennessee's waiting period in place, women seeking an abortion face significant delays in scheduling their first appointment (the one at which a physician would provide them with the information mandated by § 39-15-202(a)–(h)) and delays of up to four weeks for their second appointments (where they would undergo the procedure). *Adams & Boyle*, 494 F. Supp. 3d at 562. The delays found by the district court here are far more significant than those in *Casey*, where the district court found that Pennsylvania's 24-hour waiting period would result in delays "rang[ing] from 48 hours to two weeks" and did not make findings as to any delays that would occur for initial appointments. *Casey*, 744 F. Supp. at 1351. This is just the first piece of the puzzle showing why Tennessee's abortion waiting period is unduly burdensome.

*Medical Implications*. Burdensome on their own, the delays caused by Tennessee's abortion waiting period have significant implications for the availability of abortion in Tennessee, especially the availability of medication abortions. Medication abortions are available only through ten weeks LMP, and most women do not even learn that they are pregnant until they are between four and ten weeks LMP. *Adams & Boyle*, 494 F. Supp. 3d at 520. Thus, as the district court explained, "increased wait times can and do cause patients to miss the short cutoff date for a medication abortion." *Id.* at 562. Indeed, while the total number of abortions in Tennessee decreased following the enactment of § 39-15-202(a)–(h), the relative number of abortions occurring after ten weeks LMP increased, a trend that the district court attributed to Tennessee's 48-hour abortion waiting period. *Adams & Boyle*, 494 F. Supp. 3d at 545, 562–63.

No matter, says the majority: "Here, no one disputes that surgical abortion . . . remains available after the period for obtaining a medication abortion has lapsed." Maj. Op. at 10. "What a callous response." *FDA v. Am. Coll. of Obstetricians & Gynecologists*, 141 S. Ct. 578,

583 (2021) (Sotomayor, J., dissenting from the grant of application for stay).  The record speaks volumes about the material differences between medication abortions and surgical abortions, which are lengthier, more invasive, more painful, and potentially traumatizing for victims of sexual trauma.  *Adams & Boyle*, 494 F. Supp. 3d at 520, 525, 562–63.  Thus, as Terrell testified, patients can be "very distraught" when they learn that they will not qualify for a medication abortion because of Tennessee's waiting-period law.  *Id.* at 513.  And while surgical abortions, like medication abortions, are safe in the vast majority of cases, it is uncontested that the risk of a complication increases with gestational age.  *Id.* at 505, 513, 515, 525.  To be sure, under *Casey*, the State retains some ability to craft regulations that aim to persuade a woman to "choose childbirth over abortion."  505 U.S. at 883.  But it cannot be that the State may persuade a woman to "choose childbirth" by making the alternative a substantially more invasive, painful, and medically unnecessary procedure.  The Constitution does not suffer such a draconian result, which would obliterate the line between the persuasion that *Casey* tolerates and outright coercion.

*Casey* itself does not speak to regulations that preclude the availability of medication abortion.  Why?  Because the procedure was unavailable until the FDA approved mifepristone in 2000.  *See Am. Coll. of Obstetricians & Gynecologists v. FDA*, 472 F. Supp. 3d 183, 189 (D. Md. 2020).  But given the Court's insistence that the abortion right protects "personal dignity and autonomy," *Casey*, 505 U.S. at 851, it strains credulity to suggest that the Court in *Casey* would have handwaved the district court's findings regarding the availability of medication abortion as the majority does here.  *Gonzales v. Carhart*, 550 U.S. 124 (2007), relied on by the majority, changes nothing.  There, the Court upheld a narrow ban on a relatively uncommon form of surgical abortion that had been used for certain second-trimester abortions: a variation of the dilation and evacuation ("D & E") procedure that the Court referred to "intact D & E." *Gonzales*, 550 U.S. at 135–37.  But it is one thing to uphold a ban on intact D & E—a procedure used for a limited number of second-trimester abortions, with medical uncertainty as to whether it was more or less risky than standard D & E, *id.* at 135–37, 163—and it is another thing entirely to uphold a law that effectively precludes medication abortion, one of the most common and the most preferred abortion procedures today, for a substantial number of women.  Indeed, in *Stenberg v. Carhart*, a precursor to *Gonzales*, the Court held unconstitutional a Nebraska statute

that would have banned *all* D & E abortions because it effectuated a ban on "the most commonly used method for performing previability second trimester abortions." 530 U.S. 914, 945 (2000). As Justice Sotomayor recently observed, the "Court has never held that the Government can ban one of the most common and safest early abortion procedures without running into constitutional problems." *FDA*, 141 S. Ct. at 583 (Sotomayor, J., dissenting). To the contrary, *Stenberg* strongly supports the conclusion that laws that limit the availability of the most commonly used abortion procedures are invalid.

In sum, the impact that Tennessee's waiting-period law has on the availability of medication abortion is a significant consideration that has no corollary in *Casey* (or the Court's other abortion decisions). Add to that the district court's finding that the waiting period caused some women to miss the deadline for an abortion entirely, *Adams & Boyle*, 494 F. Supp. 3d at 562–63,[7] and the district court properly found that the medical implications of Tennessee's abortion waiting period support the conclusion that the law is unduly burdensome.

***Logistical and Financial Hurdles***. The district court found that the substantial delays caused by Tennessee's abortion waiting period "burden[] the majority of abortion patients with significant, and often insurmountable, logistical and financial hurdles." *Adams & Boyle*, 494 F. Supp. 3d at 563. Logistically, the law requires women seeking an abortion in Tennessee to come to a second appointment at an abortion clinic that is often miles away from their home. *See, e.g.*, *Adams & Boyle*, 494 F. Supp. 3d at 519, 562–63. Indeed, those women who miss the cutoff for a medication abortion on account of the waiting period may need to travel even further to obtain an abortion than they would otherwise, given that not all of Tennessee's abortion clinics offer

---

[7]Tennessee contends that the district court clearly erred in finding that Tennessee's waiting-period law causes some women to miss the cutoff date for surgical abortions. Appellants Br. at 44. In essence, Tennessee's argument is that "at best" the evidence established that § 39-15-202(a)–(h) caused a small number of women to miss certain providers' self-imposed deadlines for the procedure, not the state's legal cutoff at viability. Appellant Br. at 44–45. But Tennessee's argument ignores the nature of the undue-burden inquiry, which is highly pragmatic and turns upon the practical availability—not the legal availability—of abortion in a given state. *See June Medical*, 140 S. Ct. at 2128–31 (plurality op.); *id.* at 2139–41 (Roberts, C.J., concurring in the judgment); *Whole Woman's Health*, 136 S. Ct. at 2310–18. That women "may have been able to obtain abortions elsewhere," Appellants Br. at 45, for example, out of state, is irrelevant when they could not obtain an abortion in Tennessee. *See June Medical*, 140 S. Ct. at 2128–31 (plurality op.); *id.* at 2139–41 (Roberts, C.J., concurring in the judgment); *Whole Woman's Health*, 136 S. Ct. at 2310–18. Thus, even if Tennessee were correct that the evidence failed to establish that Tennessee's waiting-period law caused at least some women to miss the legal deadline for an abortion, the district court properly considered whether, as a practical matter, the law resulted in some women being unable to obtain an abortion in Tennessee.

surgical abortions. *See id.*[8] Financially, abortion becomes more expensive the later into a pregnancy it takes place, and the district court found that the cost of an abortion in Tennessee has increased significantly since 2013. *Id.* at 513 & n.20, 563–64. For example, the district court credited the testimony of Terrell, who testified that due to the statute's two-visit requirement, her clinic increased the costs charged for a surgical abortion from between $425 and $525 in 2013 to between $800 and $1,000 for the same procedure in 2019. *Adams & Boyle*, 494 F. Supp. 3d at 513 & n.20. These increased costs compound the already significant financial burdens on women who must forgo wages and pay for travel and childcare on multiple occasions in order to receive an abortion under Tennessee law. *Id.* at 562–63. In order to attend the two in-person visits required by the statute, "patients must take time off from work, arrange childcare, and find transportation on two different occasions." *Id.* at 563. These costs are particularly significant in Tennessee because the state had just eight abortion providers concentrated in five cities, forcing many women to travel significant distances to attend an appointment. *See id.* at 562–63 (noting that 63 percent of Tennessee women live in a county without an abortion provider). For low-income women especially, who make up the vast majority of women seeking an abortion in Tennessee, these costs can be prohibitively expensive, putting them to an impossible choice between the abortion and its attendant costs and providing for their own and their household's "basic needs." *Id.* at 564.

An example puts the financial difficulty in perspective. The district court found that the "large majority of plaintiffs' patients live in poverty" without "the funds or health insurance to cover the procedure," and that "the overwhelming majority of women seeking an abortion [in Tennessee] . . . are already mothers and are either poor or near low-income." *Id.* (quoting the

---

[8]Tennessee argues that "the district court's finding that missing the cutoff for a medication abortion would increase travel was also clearly erroneous." Appellants Br. at 48 (citing *Adams & Boyle*, 494 F. Supp. 3d at 562–63). The gist of Tennessee's argument is that the clinics that offer only medication abortions have clinics nearby that offer surgical abortion such that the travel time is the same for a woman who has missed the cutoff for a medication abortion. *Id.* The flaw in Tennessee's argument is that it ignores the varying LMP cutoffs for surgical abortions. Surgical abortions are available in Memphis, Nashville, Knoxville, and Bristol, but are available only in Memphis and Nashville after 15 weeks LMP. *Adams & Boyle*, 494 F. Supp. 3d at 562–63. Thus, a woman in Knoxville (or whose closest abortion clinic is in Knoxville) who misses the deadline for a medication abortion would be unable to obtain a surgical abortion without travelling to Nashville or Memphis if Tennessee's waiting-period law pushes her beyond 15 weeks LMP. *See id.* Therefore, it was not clear error for the district court to find that missing the cutoff for a medication abortion would increase travel time for some women who would need to travel to another clinic to obtain a surgical abortion.

trial testimony of Professor Katz) (second alteration original).  For a single mother of one, the poverty line sits at approximately $17,000 per year.  *See id.* at 527 n.30.  The cost of a surgical abortion is approximately $900, meaning that, as a result of § 39-15-202(a)–(h), this single mother would have to spend almost her entire monthly income to receive the procedure, and that does not even account for the travel, childcare, and other expenses that she would incur to attend two in-person appointments.  *See id.* at 513 & n.20.  The additional burdens and expenses caused by the statutory waiting period could place the abortion process well out of reach.  Indeed, crediting the testimony of Professor Katz, the district court found that under Tennessee's abortion regime the significant and unexpected costs of an abortion put low-income women and their families at "grave risk" of having to sacrifice necessities like food, housing, and healthcare.  *Id.* at 528, 531, 564.

The majority asserts that the district court's factual findings here "mirror" those from *Casey*.  Maj. Op. at 8.  That is simply untrue.  While the district court in *Casey* suggested that Pennsylvania's waiting-period law would increase the cost of an abortion for women pushed into their second trimester, it failed to quantify that increase, leaving its severity unknown.  744 F. Supp. at 1352.  In contrast, the district court here found that the cost of an abortion doubled in some cases under Tennessee's waiting-period law, identifying the specific increases attributable to the law.  *Adams & Boyle*, 494 F. Supp. 3d at 513–14 & n.20.  Similarly, while the district court in *Casey* found that "[t]he costs incident to obtaining an abortion . . . [would] be greater if [Pennsylvania's] 24-hour waiting period were to go into effect," it failed to make findings quantifying that burden or explaining the impact those added costs would have on women seeking an abortion.  744 F. Supp. at 1352.  Likewise, while the district court in *Casey* found that "[t]he mandatory 24-hour waiting period will be particularly burdensome to those women who have the least financial resources," it did not go further to explain how or to what extent the burdens would impact women seeking an abortion in Pennsylvania.  *Id.*  In stark contrast, the district court here went to great lengths to quantify the financial and logistical burdens that it identified and compared those to granular data about low-income populations, ultimately finding that Tennessee's waiting period "significantly delays this time-sensitive medical procedure, and also makes it so time-consuming, costly, and inconvenient to obtain that the predominantly low-income population seeking the service must struggle to access it, if they can access it at all."

*Adams & Boyle*, 494 F. Supp. 3d at 566; *cf. Casey*, 505 U.S. at 886 (noting the district court's failure to "conclude that the increased costs and potential delays amount to substantial obstacles").

In *Casey*, the Court expressly acknowledged that "at some point increased cost could become a substantial obstacle," but reasoned that "there is no such showing on the record before [it]." 505 U.S. at 901. This case has what *Casey* did not—a fully developed record quantifying the financial strain that Tennessee's waiting period causes and describing the law's impact on the 60 to 80 percent of women seeking an abortion in Tennessee who qualify as low income.

*Stigma*. On top of these financial, logistical, and medical hurdles, the district court found that "the mandatory waiting period is also gratuitously demeaning to women who have decided to have an abortion." *Adams & Boyle*, 494 F. Supp. 3d at 564. By imposing a waiting-period on abortion where no comparable requirement exists for procedures for men, the law "demeans women by implicitly questioning their decision-making ability." *Id.* Crediting the testimony of Professor McClelland, the district court found further that the "mandatory waiting period reinforces and perpetuates the stigmatizing stereotype that women are overly emotional and incapable of making rational decisions and must therefore be given an arbitrary 'time out' or 'cooling off period' to further consider the gravity of their situations." *Id.* This stereotyping and stigmatization, the district court found, "has negative health implications and a detrimental effect on the physical and psychological health of those affected, namely, all women in Tennessee who seek abortion care." *Id.* at 564–65. Yet again, the district court's findings go well beyond those in *Casey*, where the district court apparently did not consider the stigmatic effects of Pennsylvania's abortion waiting period.

The majority's insistence that "whether a law is dignified or demeaning is a question for legislators, not judges," Maj. Op. at 11, cannot be reconciled with *Casey*. As the Court explained: "It is conventional constitutional doctrine that where reasonable people disagree the government can adopt one position or the other. That theorem, however, assumes a state of affairs in which the choice does not intrude upon a protected liberty." *Casey*, 505 U.S. at 851 (internal citations omitted). Thus, in the sphere of interests protected by substantive due process—abortion among them—the state has no license to impose its vision of dignity upon the

people without judicial check.  To be sure, "[t]hat does not mean we are free to invalidate state policy choices with which we disagree; yet neither does it permit us to shrink from the duties of our office."  *Id.* at 849.  The very core of *Casey* is its insistence that

> [o]ur law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. . . . These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment.  At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life.  Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.

*Id.* at 851 (internal citation omitted).  In blindly deferring to Tennessee's will without regard for the record, the majority has conceded that it has no interest in applying *Casey* faithfully.  A law that has been proven to perpetuate harmful stereotypes about women is incompatible with Casey, a decision designed to further "[t]he ability of women to participate equally in the economic and social life of the Nation" by "facilitat[ing] . . . their ability to control their reproductive lives."  *Id.* at 856.

***

Together, the obstacles identified by the district court are more than substantial enough to make Tennessee's abortion waiting period unduly burdensome, at least for the 60 to 80 percent of women seeking an abortion in Tennessee who qualify as low income.  The record here speaks to considerations absent in *Casey*—the availability of medication abortions and the law's stigmatizing effect—and evidences substantially more severe financial and logistical obstacles than those in *Casey*.  Those financial and logistical obstacles mirror (if not surpass) those in *Whole Woman's Health*, where an admitting-privileges law led to "fewer doctors, longer waiting times, and increased crowding," while also significantly increasing the amount of travel time needed to get to an abortion facility.  136 S. Ct. at 2313.  Whatever else it may have done, the Chief Justice's concurrence in *June Medical* did not upset *Whole Woman's Health*'s conclusion (consistent with *Casey*) that those *kinds* of burdens, where substantial enough, can render a state abortion law unconstitutional.  Indeed, the Chief Justice emphasized the very same sorts of

burdens in ruling Louisiana's admitting-privileges law unconstitutional in *June Medical*. *See* 140 S. Ct. at 2140–41 (Roberts, C.J., concurring in the judgment). Because even 60 percent would qualify as a "large fraction" under *Casey*, 505 U.S. at 895, I would hold the waiting period of § 39-15-202(a)–(h) facially unconstitutional, even when considered under the Chief Justice's articulation of the undue-burden standard in *June Medical*.[9]

Apart from its attempt to compare the record here to that established in *Casey*—an argument that I have dealt with at length already—the majority concludes that Plaintiffs' facial challenge fails "[b]ecause the statistical evidence shows that most women were not prevented from obtaining abortions in Tennessee," pointing to the modest decline in abortions since 2015. Maj. Op. at 9. The majority's analysis on this point demonstrates its fundamental misunderstanding of *Casey*, which sweeps more broadly than laws that effectuate a practical ban on abortions. The Court made this clear in *Whole Woman's Health*, where it invalidated a Texas admitting-privileges law that—like the waiting-period law at issue here—imposed severe financial and logistical burdens upon women seeking an abortion. 136 S. Ct. at 2310–14. These burdens were enough to render the law invalid, despite the fact that women could still (though with great difficulty) receive an abortion with the law in place. *See id. June Medical* only underscores the import of *Whole Woman's Health* in this regard, specifically rejecting a similar "nearly impossible" formulation of the undue-burden test to the one the majority forwards here. *See* 140 S. Ct. at 2133 (plurality op.); *id.* at 2139 (Roberts, C.J., concurring in the judgment). Obstacles, even "substantial obstacles," can be overcome; the fact that women—especially low-

---

[9]Thus, even assuming that the denominator for the fraction would be "all women seeking an abortion," the test would be well satisfied here. *See Taft*, 468 F.3d at 374 (noting that the "challenged restriction need not operate as a *de facto* ban for all or even most" of the relevant population to be facially invalid). In any case, the denominator is smaller than that. *Casey* directs courts to compare the number of women unduly burdened by the law at issue (the fraction's numerator) against the number of women for whom the law "is an actual rather than an irrelevant restriction." 505 U.S. at 895. This relevance requirement means that the denominator is "a class narrower than 'all women,' 'pregnant women,' or even 'the class of *women seeking abortions* identified by the State.'" *Whole Woman's Health*, 136 S. Ct. at 2320 (quoting *Casey*, 505 U.S. at 894–95). Here, the class of women for whom the waiting period is relevant would be those women who were certain that they wanted an abortion when they sought out the service—about 95 percent of all women seeking an abortion in Tennessee, according to the district court. *Adams & Boyle*, 494 F. Supp. 3d at 567. For those women, the waiting period is relevant because it forces them to delay their abortion when they otherwise would not have; for women who were uncertain whether they wanted to have an abortion, it is possible that the waiting period is irrelevant because they may have chosen to take time to consider their decision before returning to have the procedure (or the clinic may have required them to do so). Thus, the pertinent "large fraction" is modestly larger than the 60 to 80 percent of women seeking an abortion in Tennessee who qualify as low income—either way the fraction is large enough.

income women—in Tennessee can access abortion with great difficulty does not lend Tennessee's waiting-period law facial validity.**10**     *See EMW*, 978 F.3d at 473 (Clay, J., dissenting) ("An obstacle is an obstacle, regardless of whether some might be [able] to overcome it." (internal quotation marks omitted) (alteration in original)).

**B.**

My conclusion that Tennessee's 48-hour waiting period for abortions is facially invalid is even more clear when applying the undue-burden standard as the majority of the Court articulated it in *Whole Woman's Health*. That case reads *Casey* to "require[] that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer," and balance those considerations to determine whether the law unduly burdens the right to an abortion. 136 S. Ct. at 2309 (citing *Casey*, 505 U.S. at 887–98); *see June Medical*, 140 S. Ct. at 2120 (plurality op.). Under this standard—the one that the district court properly applied—the lack of ascertainable benefits flowing from Tennessee's waiting-period law compounds the severe burdens discussed above, underscoring the law's invalidity.

On appeal, Tennessee reasserts two purported benefits that it argued before the district court: (1) "persuading women to choose life"; and (2) "the benefits the law provides women." Reply Br. at 24–25; *see Adams & Boyle*, 494 F. Supp. 3d at 557. These benefits are apparently corollaries of the statutory purpose embodied in the text of the waiting-period statute:

---

**10**In his concurrence, Judge Bush "take[s] a moment to consider how we are to" apply the large-fraction test, Bush Op. at 14, and in doing so neatly illustrates the problems with the majority's approach. He points out that even if a plaintiff could establish the reduction in abortion prevalence that the majority requires, that same plaintiff would further have to prove that the reduction resulted not from women freely choosing to continue their pregnancy but from the law precluding them from having an abortion that they wished to have. *Id.* at 15. Short of surveying every woman who considered but ultimately did not follow through on an abortion—a plainly impossible task— plaintiffs challenging abortion restrictions cannot satisfy the "rigorous statistical analysis" that Judge Bush calls for. *Id.* Such a "rigorous statistical analysis," *id.*, moreover, is contrary to *Casey* itself. The Court, in invalidating Pennsylvania's spousal-notification requirement, engaged in nothing resembling a statistical analysis. *See generally Casey*, 505 U.S. at 887–98. Instead, it considered generalized evidence regarding domestic violence and spousal abuse and concluded summarily that "[t]he spousal notification requirement is thus likely to prevent a significant number of women from obtaining an abortion." *Id.* at 893.

So why does Judge Bush insist upon a standard so out of step with *Casey*? One need look no further than the last sentence of his concurrence: "the point of the waiting-period law," according to Judge Bush, is "to ensure more time for an expectant mother to make an informed decision in the *hope* that she will choose life." Bush Op. at 16 (emphasis added). While a state may act upon its interest in potential life, it is not for Judge Bush to root so ardently for one side or the other: "Our obligation is to define the liberty of all, not to mandate our own moral code." *Casey*, 505 U.S. at 850.

"ensuring" that the woman's "consent for an abortion is truly informed consent." Tenn. Code Ann. § 39-15-202(b). Neither of Tennessee's proffered benefits, however, finds support in the record.

As for Tennessee's first "benefit," the State failed to establish that the waiting period persuaded some Tennessee women to continue with their pregnancies. Although Plaintiffs' witnesses acknowledged that there were women who did not come back for a second appointment after the waiting period's enactment, there was no evidence to suggest that those women would have obtained an abortion without the waiting period. *See Adams & Boyle*, 494 F. Supp. 3d at 557–62. For one thing, there was not credible evidence connecting the "no shows" to a change in heart caused by the waiting-period law as opposed to other possible reasons for not attending the second appointment such as a miscarriage or logistical burdens caused by the waiting period. *See id.* at 558. More importantly, however, the evidence suggested that a woman who changed her mind between her first and second appointment was unlikely to have obtained an abortion before the enactment of Tennessee's waiting-period law, such that the law did not have a demonstrable impact on women's choice to have an abortion. *See id.* Indeed, prior to the waiting period's enactment, Plaintiffs' witnesses described internal policies that prevented a woman who expressed uncertainty about whether to have an abortion from having the procedure at her first appointment, and evidence that the vast majority of women who received an abortion—as many as 99 percent—were certain in their decision. *See, e.g.*, R. 220 (T.T., Vol. II, Young Test. at 78–79) (Page ID #4870–71). As Dr. Young explained, there was a slight uptick in decisional uncertainty at the first appointment after the waiting period became effective, but the uptick was attributable to the fact that women who would not have previously scheduled a first appointment until they were certain of their choice did so in order to account for the delayed availability of abortion with the law in place. *See id.* Thus, there is minimal, if any, evidence suggesting that Tennessee's abortion waiting period appreciably benefits the state's interest in fetal life, and the district court did not err in finding that Tennessee failed to establish

that the law "advances the asserted state interest of protecting fetal life." *Adams & Boyle*, 494 F. Supp. 3d at 557.[11]

Tennessee's second "benefit"—the wellbeing of the mother—likewise lacks evidentiary support. This argument rested primarily on the assertion that the law would prevent women from having an abortion that they would later come to regret. The evidence, however, established "that post-abortion regret is uncommon." *Adams & Boyle*, 494 F. Supp. 3d at 525, 561–62. And Tennessee failed to demonstrate that its waiting period had any impact whatsoever on the rate of post-abortion regret. On this point, Tennessee relied entirely upon the testimony of Professor Coleman, whose testimony the district court did not find credible. *Id.* at 561. Professor Coleman testified that she believed that the waiting period would improve women's wellbeing because it would improve decisional certainty, thereby reducing instances of post-abortion regret. *Id.* at 560–61 But, as the district court explained at length, Professor Coleman's testimony was "deeply flawed":

> [D]efendants point to Dr. Coleman's testimony that whether to have an abortion is a stressful and emotional decision; that stress and emotions compromise decision-making and result in more "emotionally based," "hurried," and "less rational" decisions; that short time limits hinder decision-making; and that abortion is associated with negative mental health outcomes. Dr. Coleman claims that between 25% and 75% of women "feel some level of guilt" after the procedure, which may lead to feelings of regret, and that between 25% and 50% of women experience decisional ambivalence or distress, which she identified as a risk factor for poor post-abortion adjustment. She opined that the statute at issue is beneficial because giving women more time to evaluate the state-mandated information and to consider their options allows them to make "a good decision" and reduces the likelihood of adverse consequences.
>
> The Court rejects these opinions because they are flatly contradicted by the credible record evidence and are supported only by studies (including her own) which, as plaintiffs' experts showed, are irrelevant or deeply flawed and deserve no serious consideration. Prior to the passage of the statute, all of plaintiffs' patients went through an extensive and individualized informed consent process. Patients did not have only five or ten minutes to make a decision, as Dr. Coleman contends, because they began considering their options long before they arrived at the clinic and plaintiffs gave them as much time as they needed to make a

---

[11]Tennessee also contends that the waiting period "show[s] Tennessee's 'profound respect for the life within the woman.'" Reply at 25 (quoting *Gonzales*, 550 U.S. at 157). But every abortion regulation could claim that "benefit," which cannot outweigh the practical burdens identified by the district court.

decision (in addition to the numerous hours spent at the clinic). Plaintiffs' experts testified that based on their electronic health records, experience, and research, abortion patients had very high levels of decisional certainty both before and after § 39-15-202(a)-(h)'s enactment. There is no indication in this record, or in the legislative history, that prior to § 39-15-202(a)-(h) taking effect abortion patients lacked the information or time necessary to make an informed, voluntary, and uncoerced decision. Requiring patients to take additional time confers no benefit because at least 95% of women are already confident in their decisions when they attend an appointment with an abortion provider.

*Adams & Boyle*, 494 F. Supp. 3d at 560–61 (footnote and internal citations omitted).[12] Indeed, Plaintiffs proved that abortion does not result in negative mental-health outcomes for women, and the evidence suggested that the waiting period could lead to worse outcomes for women by forcing them to think about the decision for longer than they would have otherwise taken to make the decision themselves. *Id.* at 561–62; *see* R. 224 (T.T., Vol. 3-B, Huntsinger Test. at 20–21) (Page ID #5470–71). As the district court explained, "[t]he evidence clearly shows that almost all women are quite certain of their decisions by the time they appear for their first appointment and that they do not benefit, emotionally or otherwise, from being required to wait before undergoing the procedure." *Adams & Boyle*, 494 F. Supp. 3d at 559.

The severe burdens imposed by Tennessee's 48-hour waiting period plainly outweigh the law's nonexistent benefits, and this is fatal to Tennessee's defense of its 48-hour waiting period under *Whole Woman's Health*. Alone, the burdens imposed by the law are substantial.

---

[12]Tennessee insists that the district court clearly erred in finding not credible the testimony of Professor Coleman and Dr. Podraza, arguing that "[t]he district court wrongly assumed that their opinions could not be trusted because of their 'strong' pro-life views while simultaneously crediting the testimony of Plaintiffs' witnesses, many of whom were obviously strongly pro-choice." Appellants Br. at 37–38 (internal citation omitted). Tennessee's argument must fail. "When findings are based on determinations regarding the credibility of witnesses, [reviewing courts] demand[] even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). Bias is a quintessential basis upon which to discredit witness testimony, *see United States v. Abel*, 469 U.S. 45, 51 (1984), and the district court specifically found that Professor Coleman's "views as a social scientist are heavily influenced, if not entirely overridden by, her personal view," *Adams & Boyle*, 494 F. Supp. 3d at 538, and that Dr. Podraza's "strong personal and religious views on abortion . . . have influenced his medical practice," *id.* at 543. Moreover, contrary to Tennessee's characterization, the district court discredited the testimony of Professor Coleman and Dr. Podraza for much more than their personal biases, remarking upon the flaws in their methodologies, their mischaracterization of the materials relied on, and the rebuttal evidence pointing out the weaknesses in their testimony. *See id.* at 538, 541, 543. The district court made no such findings with regard to Plaintiffs' witnesses—nor does Tennessee point to any evidence that would compel that finding—and the district court did not commit clear error by crediting Plaintiffs' witnesses but not Tennessee's.

Without any benefit, they are indefensible. Thus, under either of the available articulations of the undue-burden standard, I would hold the waiting period of § 39-15-202(a)–(h) to be facially invalid and affirm the judgment of the district court.

**IV.**

We judges enjoy a great many privileges. Life tenure and compensation that "shall not be diminished," U.S. Const. art. III, § 1, make the halls of justice quite comfortable for those of us in robes. But the record in this abortion case is a stark reminder that a great many of the individuals who come through our courthouse doors—not to mention those who never have but feel the brunt of our decisions in their everyday lives—do not share in the luxuries we may take for granted. As the record here shows, most women in Tennessee—where somewhere between 60 to 80 percent of women seeking an abortion qualify as low income—do not have the privilege to rest their decision to terminate a pregnancy on moral and spiritual considerations alone. Added to their calculus are more quotidian (but often no less weighty) considerations, such as the cost of the procedure, lost wages, childcare, and the logistics of getting to an abortion clinic in another city without a car or reliable public transportation. The comforts of Article III largely insulate us judges from similar concerns in our own lives, making it all the more important for us to take these concerns seriously—to dignify the lived experiences of the persons whom we impact—when deciding the cases before us.

In this dissent, I have endeavored to do just that. Like the district court before me, I have catalogued the logistical, financial, medical, and psychological obstacles proven at trial to be caused by Tennessee's 48-hour abortion waiting period and conducted the fact-intensive inquiry that precedent—and common decency—compel. That (necessarily lengthy) inquiry reveals the detail that the majority refuses to acknowledge. Tennessee's waiting-period law puts low-income Tennessee women at real risk of having to sacrifice necessities like food, housing, and healthcare to obtain an abortion. It forces women who would otherwise qualify for noninvasive medication abortions to endure more invasive, painful, and, for some, traumatic surgical abortions. It stigmatizes women by feeding harmful stereotypes about their decisionmaking. And it does all this while providing absolutely no benefit—there is no evidence whatsoever that a waiting period improves decisional certainty or causes a woman not to have an abortion that

she would have regretted. The law before us today is nothing if not unduly burdensome; it cannot be reconciled with *Casey*.

*Casey* is a fitting place to end. There, the Court recognized what the majority here does not: that "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives." 505 U.S. at 856. That lofty rhetoric finds meaning in the facts before us today. Economically, for the vast majority of women seeking an abortion in Tennessee, the procedure is intimately tied to their ability to work, their ability to earn, and their ability to provide. Socially, abortion—and the way that the law deals with abortion—has real impact on the way that we conceptualize women's role in America. Appreciating the practical side of abortion, the Court in *Casey* also sought to balance women's interests against those of the several states: the health of the mother and "potential life." *Id.* at 870. We can debate whether, in attempting to strike its balance, the Court announced a standard that brings balancing into the legal analysis, but no one can dispute that balancing the scales was the Court's deliberate objective. The majority—which dismisses the burdens imposed by Tennessee's 48-hour abortion waiting period while unquestioningly ascribing dispositive weight to Tennessee's asserted interests—cares nothing for the balance aspired to in *Casey*. In this circuit, the scales have now tipped inescapably against women: their rights are secondary, their burdens immaterial, the obstacles they must face are nothing. *See also Preterm*, 994 F.3d 512.

I dissent.

———————————

## DISSENT

———————————

JULIA SMITH GIBBONS, Circuit Judge, dissenting. I concur in full in Judge Moore's dissent. I write separately and briefly only to emphasize the determinative reason for my dissent.

Facts matter. That premise applies in abortion cases, just as it does in other contexts. Judge Moore's opinion ably sets forth the pertinent factual findings of the district court, which are well-supported by the record and which distinguish this case from *Casey*. *See* Moore Dissenting Op. at 42–51. The majority opinion treats these findings only at a high level of generality, an approach that obscures both the specificity and strength of the evidence presented by plaintiffs and the absence of meaningful response by the state. Ultimately, the majority's inattention to the record enables a generic result that fits this waiting period within *Casey* and ignores the undue burden on Tennessee's low-income women and women who experience intimate partner violence. For this reason, I dissent.